IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 3, 2011 Session

## REGIONS BANK

v.

## BRIC CONSTRUCTORS, LLC, F/K/A
## BRIC CONTRACTORS, LLC, AND PATRICIA McINTOSH

**An Appeal from the Chancery Court for Williamson County**
**No. 35614      Robbie T. Beal, Chancellor**

_____

**No. M2010-01898-COA-R3-CV - Filed December 13, 2011**

_____

This is an action to collect a debt and to recover collateral. The defendant LLC obtained a
line of credit from the plaintiff bank. The LLC borrowed against the line of credit to
purchase certain property, and the property was pledged as collateral. Several months later,
the line of credit was converted into a fixed amount loan over a longer term, and a new
security agreement was executed pledging the same collateral. On the same day, the LLC
obtained another line of credit secured by the LLC's accounts receivable. The next day, the
LLC took an advance on the new line of credit. The LLC made monthly payments on both
obligations for almost a year, and then it defaulted. The plaintiff bank filed this lawsuit
against the LLC and its principal to collect on the loans and to recover the collateral. The
LLC contended that the principal of the LLC did not sign key documents, did not authorize
advances, and did not authorize the pledge of the collateral. After a bench trial, the trial court
held in favor of the bank based on, among other things, its finding that the principal of the
LLC had ratified any allegedly unauthorized advances made under the lines of credit. The
defendants now appeal. We reverse the finding of ratification as to one advance and remand
for further findings; in all other respects, the decision of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
is Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,
W.S., and J. STEVEN STAFFORD, J., joined.

J. Brad Scarbrough, Chris Holleman, and Timothy A. Bishop, Brentwood, Tennessee, for the Defendant/Appellants Bric Constructors, LLC, f/k/a Bric Contractors, LLC, and Patricia McIntosh

David M. Smythe, Nashville, Tennessee, for the Plaintiff/Appellee Regions Bank

## OPINION

### FACTS

Defendant/Appellant Bric Constructors, LLC ("the LLC"), is a grading and utility contracting business formed in early 1999. The original members of the LLC were a married couple, Defendant/Appellants Patricia McIntosh ("Ms. McIntosh") and Bric McIntosh ("Mr. McIntosh"). Initially, Ms. McIntosh owned 90% of the business, and Mr. McIntosh owned 10%. On July 1, 1999, Mr. McIntosh assigned his interest in Bric Constructors to Ms. McIntosh, making her the sole member of the LLC.

Although Ms. McIntosh was the sole member of the LLC, she was not involved in the day-to-day operations of the business. Instead, she delegated those operational duties to Mr. McIntosh and others. Generally, the on-site operational aspects of the business were managed by Mr. McIntosh. Neither Mr. nor Ms. McIntosh had primary responsibility to the LLC's financial operations. During most of the time in which the transactions at issue took place, the LLC's financial operations were handled by John Coleman ("Mr. Coleman"), who was the acting CFO of the business until October or November 2007.[1] Near the end of 2007, Bob Bower ("Mr. Bower") was hired to replace Mr. Coleman. Mr. Bower worked for the LLC for about six months, and then his employment terminated.

The Operating Agreement of the LLC, dated January 6, 1999, provides that the entity is member managed. Of course, after July 1999, the only "Member" was Ms. McIntosh. Section 5.2 of the Operating Agreement states specifically that each "Member" of the LLC shall have the power to bind the LLC to carry out its business, including borrowing money from banks and encumbering assets to secure the repayment of the loans:

> Each Member shall have the power, on behalf of the Company, to do all things
> necessary or convenient to carry out the business and affairs of the Company,
> including, but not limited to . . . :
>     . . .

---

[1]Mr. Coleman was not formally designated as the LLC's CFO. Rather, he was an independent contractor, paid by the hour, and was considered to be a "consultant" of the LLC.

(b) To borrow money for the Company from banks . . ., and in connection therewith, to hypothecate, encumber and grant security interests in the Property of the Company to secure repayment of the borrowed sums.  No debt shall be contracted or liability incurred by or on behalf of the Company except by the Members, or to the extent permitted under the [Tennessee Limited Liability Company] Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Members.

Thus, under this provision of the Operating Agreement, liability could be incurred by the LLC by the actions of Ms. McIntosh or by the actions of agents or employees whom Ms. McIntosh "expressly authorized to contract such debt or incur such liability."  The Operating Agreement included another proviso:  "Unless authorized to do so by this Operating Agreement or by a Member of the Company, no . . . employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose."

In 2006, the McIntoshes began a business relationship with the Plaintiff/Appellee Regions Bank ("the Bank" or "Regions").  The Bank officer for all of the transactions at issue in this appeal was Chad Hill ("Mr. Hill"), the Bank's Vice President and Business Banking and Community Banking officer.  The pertinent transactions between the Bank and the LLC are outlined below.

### Master Equipment Lease

On May 23, 2006, Ms. McIntosh, on behalf of the LLC, executed a Master Equipment Lease Agreement (the "Master Lease") with the Bank.  Under the Master Lease, the Bank would, in effect, purchase grading and compacting equipment for the use of the LLC, and then lease the equipment to the LLC.[2]  Ms. McIntosh and Mr. McIntosh both executed a Commercial Guaranty on the Master Lease, giving the Bank a personal guaranty.[3]  Pursuant to the Master Lease, the Bank purchased two pieces of equipment for the LLC – a 1991 CAT Moto Grader (purchased for $75,000) and a CAT 563E Vibratory Compactor (purchased for $118,636),

---

[2]It was customary for the LLC to either purchase the equipment and have the Bank reimburse it, or for the Bank to purchase the equipment outright and then lease it back to the LLC.

[3]In this Commercial Guaranty and all of the Commercial Guaranties signed by Mr. and Ms. McIntosh, the McIntoshes personally guaranteed performance on not only the loan at issue, but "all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower, individually or collectively or interchangeably with others, owes or will owe Lender."

referred to herein as the "leased equipment." This equipment was then leased to the LLC. On July 24, 2006, the Bank filed a UCC-1 Financing Statement with the Tennessee Secretary of State to evidence the Master Lease with the LLC.

On July 12, 2006, Ms. McIntosh, on behalf of the LLC, signed a schedule of monthly payments due to the Bank under the Master Lease. The LLC made monthly payments on the Master Lease from July 27, 2006, through October 21, 2008.

## ELOC

On March 30, 2007, Ms. McIntosh, on behalf of the LLC, executed an Equipment Line of Credit Note ("ELOC") with the Bank in the amount of $750,000.[4] At the same time, Ms. McIntosh executed a Security Agreement with the Bank ("ELOC Security Agreement"), pledging that the ELOC would be secured by "ALL EQUIPMENT TO BE PURCHASED IN THE FUTURE USING THIS FACILITY" (capitalization in original). Thus, under the ELOC, the term "facility" meant the Bank's line of credit to the LLC. As with the Master Lease, Mr. and Ms. McIntosh each executed a Commercial Guaranty in favor of the Bank, giving the Bank a personal guaranty on the ELOC. The amount owed to the Bank under the ELOC was any amount the Bank actually advanced to the LLC plus interest on that amount at a rate of 8.25%.[5] The ELOC required the LLC to make monthly payments of interest only; a "balloon payment" consisting of the outstanding amount of principal plus all accrued unpaid interest was due in full on the ELOC's maturity date, which was one year after the initial loan, March 30, 2008.

On the same date, March 30, 2007, at the request of the Bank, Ms. McIntosh signed a "Limited Liability Company Resolution to Borrow/Grant Collateral" form ("Resolution"). The Resolution indicated that Ms. McIntosh was the only representative of the LLC who was authorized to request advances and authorize payments under the ELOC. This document required Ms. McIntosh's signature for all such transactions at the Bank. The Resolution also stated that Ms. McIntosh could "designate additional or alternate individuals as being authorized to request advances under" lines of credit, but it is undisputed that Ms. McIntosh never signed a written authorization.

The Bank made five advances to the LLC under the ELOC:

---

[4]Bank officer Hill testified that this line of credit was originally approved for $500,000, but was later increased to $750,000 at the request of the LLC.

[5]This interest rate was variable.

-4-

|                          |              |
|--------------------------|--------------|
| (1) May 30, 2007         | $196,907.40  |
| (2) May 31, 2007         | $23,333.50   |
| (3) June 14, 2007        | $140,000.00  |
| (4) July 11, 2007        | $135,589.00  |
| (5) August 29, 2007      | $32,353.00   |
|                          |              |
| TOTAL:                   | $528,182.90  |

Thus, the advances to the LLC under the ELOC came to a total of $528,182.90. Ms. McIntosh and the LLC claim that only the fifth advance, $32,353 for the purchase of a 2007 Ford F150 ("2007 Ford Truck"), was authorized by Ms. McIntosh. The ELOC advances that are in dispute are discussed below.

### *The Bentley and the 2008 Ford Truck*

On April 16, 2007, Ms. McIntosh purchased a 2007 Bentley automobile ("Bentley") for $239,000 with funds that she withdrew from the LLC's checking account at the Bank. The LLC loaned the funds to Ms. McIntosh, and almost a year later on April 14, 2008, Ms. McIntosh repaid the loan to the LLC. The Bentley was titled in the name of the LLC, but it was intended only for Ms. McIntosh's personal use.

On April 26, 2007, the LLC purchased a 2008 Ford F250 Truck ("2008 Ford Truck") for $36,458, with funds from the LLC's checking account at the Bank. The 2008 Ford Truck was intended for business use for the LLC.

On May 30 and 31, 2007, respectively, the Bank made two advances to the LLC, the first for $196,907.40, and the second for $23,333.50. The total of these two advances equaled about 80% of the value of the purchase price of the two vehicles, the Bentley and the 2008 Ford Truck.[6]

Two addenda to the ELOC Security Agreement were drafted. These granted the Bank a security interest in the Bentley and the 2008 Ford Truck to secure the two advances. In addition, there were two applications for the noting of liens on the certificate of title, one for the Bentley and one for the 2008 Ford Truck. Finally, two Power of Attorney documents ("POAs") were executed on behalf of the LLC, giving the Bank the authority to record any documents necessary to transfer title of the vehicles and to evidence the Bank's security interest in the vehicles.

---

[6]According to the documents, it appears that the Bank advanced only 60% of the amount of the purchase price of the 2008 Ford Truck. The reason for this discrepancy is unclear.

Ms. McIntosh's name was signed to the two addenda, the applications, and the POAs, and her signatures were notarized. It is undisputed, however, that Ms. McIntosh did not, in fact, sign her name to the documents; someone else did. In all, regarding the ELOC, Ms. McIntosh's name was signed by someone else to six documents, executed to procure the first two advances made to the LLC under the ELOC and to pledge the vehicles as security for those advances.

The identity of the person who signed Ms. McIntosh's name to these and other documents was the subject of considerable dispute in this case. Bank officer Mr. Hill claimed that he saw Mr. McIntosh sign his wife's name, after she verbally gave Mr. McIntosh the authority to do so. Surprisingly, Mr. Hill stated that he routinely had his assistant notarize the signature on the documents as being the signature of Ms. McIntosh, even though he knew that Mr. McIntosh had actually signed his wife's name.[7] Mr. McIntosh denied signing his

---

[7]To the Court's dismay, it appears that the Bank's notaries habitually notarized signatures that they did not witness, but instead relied upon Mr. Hill's representation; it is unclear in the record whether Mr. Hill informed the notaries that someone other than Ms. McIntosh signed her name to the documents in question. Apparently the practice was so routine that, at trial, the parties stipulated as to it, so that the various notaries public would not have to testify in person at trial that they did not witness the signatures they had notarized.

Here, for example, the POAs at issue included the sworn oath of Bank notary public Kay McDonald representing that the document was "[s]ubscribed and sworn before me" on the date in question. This is pursuant to Tennessee Code Annotated § 8-16-112, which only authorizes a notary public "to acknowledge signatures upon personal knowledge or satisfactory proof" that the person signing the document is in fact who he or she purports to be. This indicates that the notary should personally witness the signature and if the person signing the document is not personally known to the notary, the notary should have satisfactory proof that the person signing the document is in fact the person whose name appears on the signature line.

This Court has discussed the importance and significance of the certification of an instrument by a notary public:

> A notary public is a public official of the state of Tennessee, Tenn. Code Ann. § 8-16-102 (2008), and one of the individuals statutorily empowered to take oaths and acknowledgments. Tenn. Code Ann. §§ 66-22-102, 8-16-112 (2008). When certifying an act, a notary must affix his or her official seal. Tenn. Code Ann. §§ 8-16-112, 66-22-110 (2008). "The affixation of the notary's seal provides prima facie proof of a notary's official character or, simply stated, that the notary is a notary." *In re Marsh*, 12 S .W.3d 449, 453 (Tenn. 2000). When discharging his or her duties, a notary public does so under oath that he or she "will, without favor or partiality, honestly, faithfully, and diligently discharge the duties of notary public." Tenn. Code Ann. § 8-16-105 (2008). Accordingly, "a presumption arises that notaries perform their public duties correctly" and lawfully. *Peltz v. Peltz*, No. M1999-02299-COA-R3-CV, 2000 WL 1532996 (Tenn. Ct. App. Oct. 18, 2000); *Manis v. Farmers Bank of Sullivan County*, 98 S.W.2d 313, 314 (Tenn.1936) (citing *Caruthers v.*

(continued...)

-6-

wife's signature on these or on any other loan documents. For her part, Ms. McIntosh denied that the signatures were hers, and denied giving her husband or anyone else the authority to sign her name to the documents.

In any event, on approximately June 7, 2007, the LLC's insurance agent sent the Bank a Certificate of Insurance, indicating that the LLC had procured insurance on the Bentley and the 2008 Ford truck, and had made the Bank the loss payee under the LLC's insurance policy regarding any damage to the two vehicles.

### *Excavator with Hammer and Bucket*

On July 11, 2007, the LLC purchased three pieces of used equipment for a total of $169,486. The three pieces of equipment were a Komatsu Hydraulic PC300 Excavator ("the Excavator") with two attachments, a Tramac Hammer ("hammer") and an HD Hensley Bucket ("bucket"). The LLC paid for these items in full with its own funds.

Shortly after that, on July 24, 2007, the Bank advanced to the LLC 80% of the purchase price of the used equipment, or $135,589, pursuant to the ELOC. The Bank also obtained from the LLC a signed addendum to the ELOC Security Agreement, which granted the Bank a security interest in equipment described as a "Hydraulic Excavator w/ Tramac V1600 Hammer Eq. #C0442 and a 36" HD Hensley Bucket Stock #A6775."[8] Again, Ms. McIntosh's name was signed on the addendum, but it was signed by someone other than Ms. McIntosh. Around the same time, the LLC faxed to the Bank a billing ticket and an invoice dated July 11, 2007, reflecting the LLC's purchase of the Excavator with the hammer and bucket.

---

[7](...continued)

> ***Harbert***, 45 Tenn. (5 Cold.) 362, 367 (1868)). "In layman's terms, a notary public's certificate means a great deal more than the 'Good Housekeeping Seal of Approval.' " ***Beazley v. Turgeon***, 772 S.W.2d 53, 59 (Tenn. Ct. App.1988); ***In re Marsh***, 12 S.W.3d at 453. When a notary certifies an instrument it "says to the world that the execution of the instrument was carried out according to law." ***Id.; see Figuers v. Fly***, 137 Tenn. 358, 370, 193 S.W. 117, 120 (1917) ("The function[ ] of a notary public [is] not to be lightly assumed[.] A [notary's] certificate of acknowledgment is an act which must in the nature of things be relied on with confidence by [persons] of business.").

***Dickson v. Long***, No. M2008-00279-COA-R3-CV, 2009 WL 961784, at *6 (Tenn. Ct. App. Apr. 8, 2009). ***See also*** John D. Perovich, J.D., *Liability of Notary Public or Bond for Negligence in Performance of Duties, or for Deliberate Misconduct in Performance of Duties*, 44 A.L.R. 3d 555 (1972).

[8]The addendum was dated July 11, 2007, the date the equipment was purchased, but it was signed on July 24, 2011.

On August 2, 2007, the Bank filed a UCC-1 Financing Statement with the Tennessee Secretary of State reflecting its security interest in property described in a manner almost identical to the description in the addendum to the ELOC Security Agreement. On August 30, 2007, the Bank received a certificate of insurance from the LLC's insurance agent, indicating that the Bank had been listed as the loss payee on the LLC's insurance policy for the Excavator with the hammer and bucket.

The LLC made monthly interest payments on all advances to the Bank on the ELOC beginning July 2, 2007, and continued doing so through December 2007, at which time the ELOC was termed out and the debt was converted into the Fixed Asset Note discussed below.

### AR Note

On December 26 or 27, 2007, Mr. and Ms. McIntosh went to the Bank to procure a business line of credit for the LLC in the amount of $500,000, to be secured by the LLC's accounts receivable.[9]  To this end, Ms. McIntosh signed an Accounts Receivable Note ("AR Note") and an accompanying Commercial Security Agreement ("AR Security Agreement"), which granted the Bank a security interest in all of the accounts receivable of the LLC.  On the same date, Ms. McIntosh signed another Resolution form, again stating that she was the only person authorized to borrow money from the Bank on behalf of the LLC.  Mr. and Ms. McIntosh each signed another Commercial Guaranty, each personally guaranteeing any debt owed to the Bank by the LLC on the AR Note.  The AR Note, like the ELOC, required monthly payments of interest only, with a balloon payment consisting of the outstanding amount of principal plus all accrued unpaid interest due in full on the AR's maturity date, which was one year and one month after the loan, January 26, 2009.  On January 30, 2008, the Bank filed a UCC-1 Financing Statement with the Secretary of State on its security interest in the LLC's accounts receivable.

The next day or two, on December 28, 2007, the Bank advanced $400,000 to the LLC on the AR Note.  The documents do not indicate who made the request for this advance on behalf of the LLC.  Bank officer Mr. Hill claimed that Ms. McIntosh gave verbal approval for the advance when she signed the documents.  Ms. McIntosh denied that she authorized the advance or that she even knew about it.  Nevertheless, several months later, in April 2008, it is undisputed that Ms. McIntosh personally requested and authorized a draw of $100,033 under the AR Note, an amount which appears to correlate precisely with the amount that

[9]All of the documents signed on that day were dated December 26, 2007, but Mr. Hill claimed that they were actually signed on December 27, 2007, to accommodate Ms. McIntosh's schedule.  The discrepancy in the dates does not impact our analysis of the issues raised in this appeal.

remained available for advance under the AR Note. These were the only two advances made to the LLC under the AR Note.

Regardless of any dispute regarding the authorization for both advances, the LLC made regular interest payments on the entire indebtedness under the AR Note from February 2008 through January 2009.

## FA Note and Modified FA Note

On the date that Ms. McIntosh signed the AR Note, on December 26 or 27, 2007, the Bank presented Ms. McIntosh with a loan package that purported to "term out" or pay off the ELOC by renewing that debt under different terms. At the time the package was presented, Mr. Hill explained to Ms. McIntosh that the new arrangement was designed to refinance the ELOC, so that the balance due ($528,000) under the ELOC would be a fixed amount to be paid back over a five-year term at a 7.8% interest rate.

Ms. McIntosh would later claim that she was surprised when Mr. Hill presented her with these documents, because the ELOC had not yet reached maturity. Nevertheless, Ms. McIntosh did not ask for a delay to consider the package, and she signed all of the documents in the loan package as presented. The loan package included a Business Loan Application, which stated that the purpose of the loan was a "Renewal Account." The package also included a Promissory Note on behalf of the LLC in the fixed amount of $528,000; this is referred to in the record as the Fixed Amount Note ("FA Note"). Along with the FA Note, Ms. McIntosh signed a Security Agreement ("FA Security Agreement"), pledging six items as collateral for the FA Note: the Bentley, the 2008 Ford Truck, Excavator with the hammer and bucket, and a 2007 Power Curber. She also signed an Agreement to Provide Insurance, promising on behalf of the LLC to insure the collateral and to designate the Bank as the loss payee under the insurance. Lastly, both Mr. and Ms. McIntosh signed another Commercial Guaranty, each personally guaranteeing any debt owed to the Bank by the LLC on the FA Note.

At some point, the LLC sold the 2007 Power Curber, part of the collateral for the FA Note. On February 21, 2008, the LLC paid the Bank $140,000 in proceeds received from the sale of the Power Curber. The Bank applied these proceeds to the principal amount of the FA Note.

Based on this substantial payment, on March 21, 2008, Ms. McIntosh, on behalf of the LLC, executed a Modified Fixed Asset Note ("Modified FA Note") in the amount of $373,103.67, which was the balance that remained on the FA Note after application of the Power Curber

sale proceeds.  The Modified FA Note stated expressly that it was intended to be a modification of the FA Note:

> PRIOR NOTE.  This note is made and executed for the purpose of continuing, modifying and amending the terms of that certain promissory note in the principal amount of $528,000.00, dated 12-26-2007, executed by the Borrower and payable to the Bank or its predecessor or assignor.  This note shall constitute a true modification or amendment of the terms of the original note which original note shall continue in full force and effect except as specifically modified herein.  This note shall not constitute a novation, payment in full or satisfaction of the original note, nor shall this note in any other way supersede the original note or any of the Loan Documents.  This note shall continue to be secured by any and all collateral securing the original note.

Thus, the LLC's obligations under the FA Note remained intact "except as specifically modified" in the new Modified FA Note.

After the Modified FA Note was executed, the LLC made regular payments to the Bank on it from March 28, 2008, through October 21, 2008, when the last payment of $5,740.27 was received by the Bank.

### Default

Sometime in late 2008, the LLC was in default under the Modified FA Note, the AR Note, and the Master Lease.  The Bank accelerated the balances owing under all of these obligations.  In February 2009, the Bank sent the LLC a letter, requesting payment of all balances due.  The letter also asked the LLC to surrender to the Bank its accounts receivable, and all construction equipment and vehicles that were pledged as collateral for the loans and the lease.  *See* Tenn. Code Ann. § 29-30-106(1)(A).

### PROCEEDINGS BELOW

### Lawsuit

On February 24, 2009, the Bank filed the instant lawsuit, titled Verified Complaint and Action to Recover Personal Property, against the LLC and Ms. McIntosh (collectively, "Defendants").[10]  The Bank sought recovery on the LLC's default on the Modified FA Note,

---

[10]Mr. McIntosh was also named as a defendant.  However, on March 31, 2009, Mr. McIntosh filed a petition
(continued...)

the AR Note, and the Master Lease, and also sought recovery of the various items of leased equipment and pledged collateral — the vehicles, the Excavator with the hammer and bucket, and the LLC's accounts receivable. The Bank requested an Expedited Writ of Immediate Possession with respect to all of the pledged collateral and leased equipment and permission to exercise its rights as a secured creditor to collect the accounts receivable and sell the collateral. It sought damages in the amount of the unpaid balances on the three debts, less any credits received from collection on the accounts receivable and sale of the pledged collateral. It also sought to hold Ms. McIntosh personally liable for all of the LLC's debts, pursuant to the personal guaranties signed by her. In addition, the Bank requested an award of attorney fees, pursuant to the notes and guaranty agreements.

On March 31, 2009, the Bank filed a second UCC-1 Financing Statement with respect to the Excavator, this time describing the collateral more specifically as "One (1) Komatsu, Model PC 300LC-6 Hydraulic Excavator (Serial No. A 84619) with a Tramac V1600 Hammer, Eq.# C0442 and a 36" HD Hensley Bucket, Stock # A 6775."

In May 2009, the Bank repossessed the Excavator without the hammer and bucket attachments.[11] The Bank retained possession of the Excavator throughout the proceedings.[12]

On June 20, 2009, the two pieces of leased equipment were sold, and the Bank received $91,158.75 from the sale. This amount was applied to the balance owed on the Master Lease, leaving a deficiency on the Master Lease of $49,170.06, as of September 16, 2009. The parties reached an agreement as to the vehicles, under which Mr. and Ms. McIntosh were enjoined from using the vehicles until they obtained insurance coverage for the Bentley that named the Bank as the loss payee. In return, the Bank agreed not to sell the vehicles.

---

[10](...continued)
in bankruptcy. Consequently, the Bank voluntarily dismissed him from the lawsuit on the day of trial, September 29, 2009.

[11]Although a bucket was attached to the Excavator when it was repossessed, it was not the bucket in which the LLC had a security interest. Therefore, the bucket was returned to the place from which it was repossessed, and the Bank kept the Excavator without any attachments.

[12]Notice of a private sale was sent to the Defendants, informing them that the sale would take place unless the Excavator was redeemed from the Bank by June 4, 2009. The Defendants objected to the sale. The sale was delayed due to the unsuccessful claims of a third party, Danny Suiter, that he owned the Excavator. Mr. Suiter filed a petition to intervene in this lawsuit, claiming that he owned the Excavator because he had purchased it from the LLC in November 2008. The trial court permitted Mr. Suiter to intervene, but, after a hearing, determined that Mr. Suiter had not established his claim by a preponderance of the evidence. Mr. Suiter did not appeal the trial court's decision, and the claims brought by Mr. Suiter as the intervenor are not at issue in this appeal.

**Trial**

The bench trial took place on two non-consecutive days, September 29, 2009, and October 29, 2010. The trial court heard testimony from, *inter alia*, Bank Officer Mr. Hill, Ms. McIntosh, and a handwriting expert.

At the outset, Mr. Hill testified in detail about three transactions described above. Regarding the ELOC, Mr. Hill said that the Bank had agreed to finance 80% of the LLC's purchase of equipment through the ELOC. Although Mr. Hill conceded that the 80% figure was not reflected in the ELOC loan documents, he identified correspondence between the parties indicating that the parties understood this to be their agreement, and that they acted in accordance with it.

Mr. Hill testified that the LLC specifically asked the Bank to finance the purchase of the Bentley and the 2008 Ford Truck through the ELOC. Prior to advancing the funds for the Bentley, Mr. Hill said, he had multiple conversations about the purchase with Ms. McIntosh, Mr. McIntosh, and Mr. Coleman, whom he understood to be the LLC's CFO. Mr. Hill said that these conversations were both in person and on the telephone. Mr. Hill testified that, before he would agree for the Bank to finance the Bentley purchase, he required the LLC to have $1 million in liquid assets. This precondition was met. Mr. Hill identified a letter to him from Mr. Coleman as CFO of the LLC, dated April 26, 2007. In the letter, Mr. Coleman asked the Bank to deposit 80% of the purchase price of both vehicles into the LLC's general Bank account, as they had "discussed earlier." In a follow-up letter dated May 8, 2007, Mr. Coleman assured Mr. Hill that title to the truck would be available to send to Mr. Hill that week.

Mr. Hill described the parties' meeting at the LLC's office to execute the documents for the Bank's advance on the vehicles. On the agreed date, Mr. McIntosh and Mr. Coleman were present, but Ms. McIntosh was unavailable. When Mr. McIntosh called Ms. McIntosh on the telephone, she said that she could not attend the meeting but asked Mr. Hill if Mr. McIntosh could sign the required documents on her behalf. Mr. Hill testified that he replied, "that would be fine." He said: "She specifically requested could he [Mr. McIntosh] sign, and I said, 'If it's okay with you, it's fine with me.' " As background, Mr. Hill indicated that Ms. McIntosh had authorized Mr. McIntosh to sign her name on "a number of occasions," and that she specifically did so with respect to the documents on pledging the vehicles as collateral for the ELOC. Mr. Hill conceded that there was no writing giving Mr. McIntosh authority to sign, but he insisted that Mr. McIntosh's authorization to sign Ms. McIntosh's name was "unequivocal." He stated: "There was full faith and acknowledgment from Ms. McIntosh as it had been customary in our prior dealings for her to verbally tell me that it would be okay for [Mr. McIntosh] in tandem with Mr. Coleman, who was the CFO, to

engage in these transactions." After talking with Ms. McIntosh by telephone, Mr. Hill observed Mr. McIntosh sign Ms. McIntosh's name to the six documents related to the advances that were secured by the vehicles.[13]

Mr. Hill admitted that he asked his assistant, Kay McDonald, to notarize Ms. McIntosh's signature on the POAs, even though Mr. McIntosh had in fact signed Ms. McIntosh's name to the documents. He explained that this was done in the interest of convenience and to accommodate the McIntoshes. Mr. Hill commented that Ms. McIntosh had been "very appreciative for years over and over of how accommodating we were to her company and to her."

Mr. Hill identified a billing receipt with handwritten notes by him and by Mr. Coleman, indicating that the Bank had agreed to advance 80% of the purchase price of the Excavator and attachments through the ELOC. Mr. Hill testified that Mr. McIntosh signed Ms. McIntosh's name to the addendum to the Security Agreement, pledging the Excavator with the attachments as security for the ELOC. Mr. Hill stated that, again, after he arrived at the scheduled closing on this transaction, he was told that Ms. McIntosh was unavailable. Again, Mr. McIntosh called his wife on the telephone, with Mr. Hill present, to get authority to execute the documents for her. Mr. Hill said that he did not actually speak to Ms. McIntosh on that occasion, but it was clear from what he heard that Mr. McIntosh was given authority to sign Ms. McIntosh's name.

Mr. Hill described the events in December 2007, surrounding the AR Note and the FA Note. Mr. Hill claimed that he postponed his holiday vacation travel in order to accommodate the desire of the McIntoshes to close on the loans before the end of the calendar year so that the changes could be reflected on the LLC's year-end balance sheet. According to Mr. Hill, the McIntoshes wanted to enhance the LLC's bonding ability, and incorporating these transactions into the LLC's year-end financial reports would accomplish this goal by showing increased liquidity and long-term (rather than short-term) debt. Mr. Hill explained:

> [The LLC was] on the verge of growing their company, and it was very important that their liquidity position was showing a favorable year-end balance. So we came in to do the transaction right after Christmas for this very

---

[13]In total, ten loan documents ostensibly bore the signature of Ms. McIntosh, but were in fact signed by someone else. Seven of the documents related to the ELOC: two certificates of title on the vehicles, two POAs, two addenda to the Security Agreement pledging the vehicles as collateral, and one addendum to the Security Agreement pledging the Excavator and attachments as collateral. The other three documents related to the Master Lease and are not directly at issue in this appeal.

purpose to improve the balance sheet of Mrs. McIntosh's company. We did [the AR Note] in commensuration with the term out of the line of credit.

Regarding the AR Note, Mr. Hill insisted that Mr. and Ms. McIntosh were both fully aware of the Bank's $400,000 advance on the note, and in fact requested it. He said: "That was not anything of sorts of my idea. I could have waited until January, February." Mr. Hill said that Ms. McIntosh actually authorized drawing the entire $500,000, but the next day, the acting CFO of the LLC at that time, either Mr. Coleman or Mr. Bower, called him and confirmed a draw of only $400,000. Pursuant to this, Mr. Hill said, the Bank deposited $400,000 into the LLC's account. Mr. Hill explained that the advance was made a day or two after the closing, in order to save interest costs for the LLC.

Regarding the FA Note, Mr. Hill explained that the ELOC was "termed out" and refinanced because the ELOC was no longer being used to purchase equipment, and because the LLC wanted the ELOC debt to be a long-term loan. He stated that, before Ms. McIntosh executed the documents, he reviewed the loan documents with her, discussed the items that had been funded under the ELOC, and explained to her that the ELOC was being refinanced into the FA Note. Mr. Hill pointed out that Ms. McIntosh signed the FA Security Agreement pledging all of the items of collateral, including the vehicles and the Excavator, as security for the FA Note. He testified that the principal on the FA Note had been reduced by the proceeds from the sale of the Power Curber, and that the LLC benefitted from the Modified FA Note, because it carried a lower interest rate and reduced the LLC's required payments from $10,685 per month to $7,400 per month. Based on the FA Note, as renewed in the Modified FA Note, Mr. Hill confirmed that the Bank was asserting its right to enforce its security interest in the Bentley, the 2008 Ford Truck, and the Excavator.

Mr. McIntosh also testified at trial. Initially, he explained his areas of responsibility for the LLC. Mr. McIntosh said that, from 2000 through 2007, he functioned as the LLC's "chief manager," which was a "hands on" position, hiring and training workers in the field. After 2007, he was focused more on developing the business of the LLC.[14] He claimed that, during the time period in question, he was not involved in the financing, accounting, or administrative aspects of the company; instead, other persons were hired to handle those responsibilities. Mr. McIntosh claimed that he was not the LLC "point man" on financing, and he indicated that this was the responsibility of the LLC's CFO. He said that the loan details and bonding issues were beyond his expertise, and he never discussed them with Mr. Hill.

---

[14]By 2007, he stated, the business was worth about $15 million.

Mr. McIntosh admitted that he was authorized to sign Ms. McIntosh's name to some documents, but claimed that this authorization was limited to the endorsement of checks, deposit slips, and things of that nature. He said that, if he was not sure whether he had authority to sign Ms. McIntosh's name to a document, he would first call her to find out; he testified that he had never signed his wife's name to a document unless he understood that he had her permission to do so.

Mr. McIntosh claimed that he had never signed his wife's name to loan documents or "anything that would obligate her." He specifically denied signing Ms. McIntosh's name to any of the loan documents involved in this lawsuit, and he claimed that he did not know who may have signed her name to them. He said that their home was only about one mile from the LLC's office, so "she's always been available" to sign documents. Mr. McIntosh specifically denied several of Mr. Hill's assertions:

> Q: Do you ever recall either telling Mr. Hill [that you had permission to sign your wife's signature] or listening to your wife tell Mr. Hill that [it was okay for you to sign your wife's signature to documents if your wife was not available]?
> A: No. I do not recall any of that, no.
> Q: And if Mr. Hill testified in trial that that did occur, would he be lying?
> A: I can't recall ever her telling me to execute documents for him.
> Q: Did you ever sign any documents with your wife's signature in front of Mr. Hill?
> A: No.

In addition, Mr. McIntosh specifically denied that he had authorized any advances to the LLC on either the ELOC or the AR Note. He acknowledged, however, that CFO Mr. Bower had authorized draws on the AR Note.

The Bank called a handwriting expert, certified document examiner Jane Eakes ("Ms. Eakes"), to testify at trial about the signatures on the documents. Ms. Eakes examined the signatures on the ten challenged documents and compared them with genuine signatures of Mr. and Ms. McIntosh; she did not compare them to the signatures of any other persons. From this examination, she concluded that the signatures on the ten questioned documents were not written by Ms. McIntosh. She also opined that eight of the ten signatures were actually penned by Mr. McIntosh, and she explained in detail the basis for her conclusion. As to the remaining two documents, Ms. Eakes found that the signatures may have been written by Mr. McIntosh, but she felt that she did not have enough evidence to draw that

conclusion.[15] Among the eight documents that Ms. Eakes said were signed by Mr. McIntosh were the seven documents that were used to pledge the vehicles and the Excavator as security for the ELOC. Therefore, contrary to the testimony of Mr. McIntosh, Ms. Eakes opined that Mr. McIntosh in fact signed his wife's name to those documents.

Ms. McIntosh testified on her own behalf. Ms. McIntosh said that, as is stated in the LLC's Operating Agreement and the Resolution forms signed at the Bank, she is the only person authorized by the LLC to pledge collateral. She admitted that she was not involved in the LLC's day-to-day operations,[16] and said that, at times, she allowed Mr. McIntosh to make business decisions for the LLC when she was not at the office. Like Mr. McIntosh, Ms. McIntosh claimed that she was also uninvolved in the financial decision-making for the LLC. She said that the acting CFO and Mr. McIntosh would make such decisions for the LLC, and then discuss the financial matters with her at the end of any negotiations with the Bank.

Ms. McIntosh insisted that she had "never authorized anyone to sign [her] name to documents," and had given neither written nor verbal authorization for anyone other than herself to pledge collateral on behalf of the LLC. She testified that Mr. McIntosh was not authorized to sign her name to any documents other than checks, and knew of no instance in which he had signed her name without authorization.

As to the documents at issue in this case, Ms. McIntosh recalled signing the loan packages related to the ELOC, the AR Note, the FA Note, and the Modified FA Note. She said that she did not sign the challenged documents pledging the vehicles or the Excavator as collateral for the ELOC, and that Mr. McIntosh was not authorized to sign her name to those documents. Ms. McIntosh claimed that Mr. Hill was lying when he testified that she had given Mr. McIntosh authorization to sign her name to the challenged documents. She did not know who signed her name to the documents; she agreed that Mr. McIntosh could have signed them, but added, "I just don't know for sure. . . . Anyone could have actually."[17] Regarding the Excavator, Ms. McIntosh speculated that Mr. Coleman may have signed the addendum to the Security Agreement pledging the Excavator and attachments as collateral for the ELOC.

---

[15]The two signatures that were inconclusive related to the Master Lease and are not at issue in this appeal.

[16]Ms. McIntosh professed to be unaware of the amount of her personal draw from the LLC in 2008.

[17]Ms. McIntosh testified that Mr. Coleman and Mr. Bower had acted outside their authority when they worked for the LLC, engaging in conduct such as writing checks without the authority to do so. Ms. McIntosh speculated that they or someone else working for the company may have signed her name to pledge collateral without her knowledge. She did not testify about why anyone else would have a motive to do so.

Ms. McIntosh explained that she purchased the Bentley for her own personal use, and that she personally borrowed funds from the LLC to make this purchase. She claimed that she did not see the documents requesting an advance on the ELOC for the purchase of the Bentley until this lawsuit was filed. She recalled requesting an advance from the ELOC for only one item, the 2007 Ford Truck. She did not recall funding the vehicles, the Excavator, or the Power Curber through advances from the ELOC. She also disputed Mr. Hill's testimony that the ELOC funded 80% of equipment purchases and claimed that it funded 100% of such purchases.

Contrary to the testimony of Mr. Hill, Ms. McIntosh specifically disputed that she was ever unavailable to sign essential documents. She claimed that she "always came in" to the office, noted that she lived close to the office, and added, "Sometimes people come to the house because it's so close. I've signed at the kitchen table and things like that just as a convenience to me. But I've never had a problem with it or even missed a loan signing." Ms. McIntosh later testified, "I wasn't in the office a lot, but I had an office and I had an in-box. It was always piled up with things for me to sign."

At the meeting with Mr. Hill in December 2007, Ms. McIntosh said, she was surprised when he presented her with the loan package on the FA Note, as she was expecting only to close on the AR Note at that time. She testified, "They said, we're just changing the terms of [the ELOC], to extend the terms of it. I said, oh, okay." Ms. McIntosh acknowledged that she in fact signed the FA Note at that time. In that meeting, Ms. McIntosh claimed, she was informed of the collateral that had been securing the ELOC. She claimed that she was not aware at that time that the Bentley, the 2008 Ford truck, or the Excavator had been pledged as collateral for the ELOC, and also claimed that she was not aware that she was ratifying the pledge of that collateral by signing the documents related to the FA Note. She indicated that she had "assumed that the equipment listed as collateral had been purchased with" funds advanced from the ELOC. Ms. McIntosh testified, "I knew of none of the transactions until [the December 2007 meeting]. I was not aware of any of the loan draws. . . . When I sat in front of the loan documents, I find now that they stated that those six pieces of equipment were purchased with the original line of credit." She claimed that there was "no way for me to know that" the items of collateral had not been purchased with ELOC funds. When asked whether she ever looked at the LLC's records related to the loans, Ms. McIntosh replied, "We had no records regarding these loans." Nevertheless, Ms. McIntosh recognized that the LLC had received $528,000 in advances from the Bank, and that the LLC had made monthly payments to the Bank for amounts advanced under the ELOC, the FA Note, and the Modified FA Note through October 2008 without objection.

Ms. McIntosh denied authorizing the Bank's $400,000 advance on the AR Note, and she also denied that she gave anyone else the authority to request such an advance for the LLC. She

claimed to have "no idea" why the advance was made soon after the AR Note was signed. Nevertheless, she admitted that the LLC in fact received those funds, and that it made monthly payments of interest on those funds without objection. Ms. McIntosh admitted giving written authorization for the subsequent $100,033 draw, and that the LLC continued to make payments on the AR Note after that draw.

## Trial Court Decision

On March 29, 2010, the trial court entered its findings of fact and conclusions of law, analyzing the transactions and ultimately holding in favor of the Bank. Regarding the Defendants' liability on the FA Note, as reduced under the Modified FA Note, the trial court found that, when Ms. McIntosh executed the FA Note loan documents, she was deemed to have known what was in those documents. Therefore, in doing so, she reaffirmed all of the advances previously made pursuant to the ELOC. The trial court also held that, because the Defendants accepted the benefits of the notes and continued to make payments on the notes for several months without objection, they ratified any unauthorized advances that may have been made under the ELOC. In its analysis, the trial court referred to the ELOC as the "Equipment Note," and to the FA Note as the "Renewal Equipment Note," indicating that the FA Note was a "renewal" of the ELOC. The trial court explained:

> In this case, the Court finds that the granting of security interests under the Equipment Note [ELOC] and/or the funding of the five (5) different advances under the Equipment Note [ELOC] . . . all were reaffirmed by Bric, LLC when Patricia McIntosh admittedly executed and delivered to Regions Bank on December 26, 2007, the Renewal Equipment Note [FA Note] and related documents . . . . While Patricia McIntosh testified that she did not read or review this Renewal Equipment Note [FA Note] package, Tennessee Law has long held that a person is charged with knowing the contents of Contracts which they sign, irrespective of whether they read the document or not.
>
> In executing the Renewal Equipment Note [FA Note] documents in December, 2007, Patricia McIntosh affirmatively and unequivocally ratified all earlier unauthorized acts and/or signatures of Bric, LLC's agents or employees with regard to Regions Bank's perfection of its security interests in the (2) vehicles and/or in the Excavator. As further evidence of Bric, LLC's ratification of the Equipment Note [ELOC], the Court finds that Bric, LLC made regular monthly payments on the Equipment Note [ELOC] from the time of its inception as a Equipment Line of Credit Note on March 30, 2007, up to the time of the December, 2007, Renewal Equipment Note [FA Note] and thereafter, and that regular monthly payments continued on the Equipment Note [ELOC] until an October 21, 2008, payment of $5,740.27, at which time

-18-

payments stopped. Further, the Court finds that Bric, LLC never complained or objected to any of the Equipment Note [ELOC] advances and/or to the security interests granted to Regions Bank to secure the Note until after the Note was in default and only after the lawsuit in this case was filed.

The trial court specifically rejected the Defendants' assertion that the Bank's claims were invalidated by the fact that someone other than Ms. McIntosh signed her name to the ELOC documents. The trial court acknowledged Ms. McIntosh's testimony that she had authorized only one advance under the ELOC, and that she did not sign any of the ten questioned documents in this case. It held, however, that the Defendants ratified the allegedly unauthorized transactions, and consequently "the defenses of either unauthorized signatures and/or unauthorized advances being asserted by the Defendants [do not] constitute valid defenses under Tennessee Law to Regions Bank's claims for monies owed."

Given its conclusion that the Defendants ratified the allegedly unauthorized transactions, the trial court found that it did "not have to decide who signed the ten (10) questioned documents introduced as documentary evidence." Nevertheless, the trial court made the specific finding that Mr. McIntosh had signed at least eight of the ten questioned documents. In making this finding, the trial court determined that the testimony of Mr. McIntosh on this issue was not credible, and it expressly credited the testimony of Ms. Eakes and Mr. Hill:

> . . . [T]he testimony of Bric McIntosh, Patricia McIntosh's husband, that he did not sign the ten (10) questioned documents, is not credible. Instead, the Court credits the testimony of Regions Bank's forensic handwriting witness, Jane Eakes, who testified that, based on her analysis of Mr. McIntosh's subconscious handwriting habits, that in her opinion, Mr. McIntosh signed his wife's signature to eight (8) of the ten (10) questioned documents. The Court credits this testimony and finds it persuasive with regard to the issue of who signed at least eight (8) of the ten (10) questioned documents.
> . . . The Court also credits the testimony of Chad Hill, that six of the questioned documents (Trial Exhibit 19) were signed by Bric McIntosh, by signing Patricia McIntosh's signature, in Mr. Hill's presence.

The trial court held that a party such as the LLC or Ms. McIntosh cannot disavow a transaction after receiving the benefits of the transaction and making payments over a long period of time, and then complain about the transaction only after default has occurred. For

this reason, the trial court held, the Defendants were estopped from contending that any of the signatures of Ms. McIntosh were unauthorized.[18]

Regarding the AR Note, the trial court concluded that the LLC ratified the allegedly unauthorized AR Note advance of $400,000 by accepting the funds and by making monthly payments:

> The Court also finds that Bric, LLC, affirmatively and unequivocally ratified the allegedly unauthorized A/R Note advance of $400,000, admittedly transferred by Regions Bank to Bric, LLC's deposit account with Regions Bank on December 28, 2007 (Trial Exhibit 30), because Bric, LLC received the benefit of this cash advance, because Bric, LLC, made regular monthly payments on its A/R Note from February, 2008, through a January 6, 2009, payment of $2,065.96, at which time payments stopped. Further, the Court finds that Bric, LLC never complained or objected to this $400,000.00 December, 2007, A/R Note advance until after the A/R Note was in default and only after the lawsuit in this case was filed.

Though it was undisputed that there was no written authorization for the $400,000 advance on the AR Note, the trial court did not make a factual finding as to whether Ms. McIntosh verbally authorized this advance, concluding that such a determination was unnecessary in light of the finding that the request for the advance was ratified.

With respect to the Master Lease, the trial court held that the LLC had "affirmatively and unequivocally ratified all aspects of the May, 2006, Lease transaction between the parties." The documentary evidence admitted at trial showed that the Bank fully paid for the leased equipment, that Ms. McIntosh signed a schedule attached to the Master Lease, and that the LLC made regular monthly payments under the Master Lease without objection. Therefore, as with the FA Note and the AR Note, the trial court determined that the Defendants ratified the Master Lease through their course of conduct. It concluded: "As a matter of law, a ratification of the Equipment Note, the A/R Note and the [Master] Lease occurred in this case."

---

[18]The Defendants assert that the trial court made a specific finding that Mr. McIntosh's signature on the ELOC documents was "unauthorized." The Bank, on the other hand, claims that the trial court found that the signatures *were* authorized. We respectfully disagree with both of these interpretations. Rather, the trial court held that the Defendants were estopped from asserting that Ms. McIntosh's signatures were unauthorized based on the ratification doctrine.

Based on this conclusion, the trial court held the Defendants jointly and severally liable to the Bank in the amount of $359,547.98 plus $1,109.49 in interest on the Modified FA Note, and in the amount of $516,077.07 plus $1,399.34 in interest on the AR Note. Ms. McIntosh was held personally liable by virtue of the personal guaranties that she had signed. The trial court declined to make any award to the Bank based on the Master Lease, because the Bank had not proven that the prices obtained at the auction of the leased equipment were fair values. In addition, the trial court denied the Bank's request for attorney fees "because had Regions Bank used proper procedures, this matter would have never been an issue before this Court."

On April 28, 2010, the Defendants filed a motion to alter or amend or for a new trial. On August 13, 2010, the trial court entered an order denying this motion.[19] From this order, the Defendants now appeal.[20]

### ISSUES ON APPEAL AND STANDARD OF REVIEW

The issues raised on appeal, as stated by the Defendants, are as follows:

1. Whether the trial court erred in ruling that the December 26, 2007 FA Note was a renewal of the $750,000 ELOC Note?
2. Whether the trial court erred in ruling that the December 26, 2007 FA Note and Security Agreement and the Modified FA Note were enforceable contracts?
3. Whether the trial court erred in ruling that the Bank possessed a security interest in the Bentley, the 2008 Ford Truck, and the Excavator based on ratification?
4. Whether the trial court erred in ruling that the Defendants are liable for the $400,000 draw on the AR Note based on ratification?
5. Whether the trial court erred in ruling that the Bank has a perfected security interest in the Bentley and the 2008 Ford Truck?
6. Whether the trial court erred in ruling that the Bank has a valid security interest in and perfected lien on the Excavator?

---

[19]In its August 13, 2010 order, the trial court corrected a mistake and modified the judgment to $878,133.88.

[20]The trial court granted the LLC's motion to stay the judgment pending appeal and to allow the LLC to proceed as a poor person, but it ordered that the Bentley and the 2008 Ford Truck be turned over to the county sheriff's office for safekeeping throughout the pendency of the appeal.

This case was tried before the trial court without a jury. Therefore, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *see* ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001). "Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary." ***Hughes v. Metro. Gov't of Nashville & Davison County***, 340 S.W.3d 352, 360 (Tenn. 2011) (citing ***Wells v. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999)). Issues of law are to be reviewed *de novo*, with no presumption of correctness in the trial court's decision. ***Id.*** (citing, *inter alia*, ***Graham v. Caples***, 325 S.W.3d 578, 581 (Tenn. 2010)).

## ANALYSIS

We analyze first the issues regarding the FA Note and the FA Security Agreement, then ratification as to the ELOC and the AR Note, and then the Bank's security interest in the collateral.[21]

## Enforceability of the FA Note and the FA Security Agreement

We address first the Defendants' argument that the trial court erred in ruling that the December 26, 2007 FA Note and the FA Security Agreement, as renewed in the Modified FA Note, were enforceable contracts. The trial court indeed held that the FA Note loan

---

[21]We note that, in the opening statements by counsel at the outset of the trial, counsel for the Defendants LLC and Ms. McIntosh acknowledged that she executed the ELOC, the AR Note, and the Master Lease, and that the LLC was legally bound by those documents. He repeatedly acknowledged that, regardless of whether the monies received by the LLC pursuant to these agreements were authorized, the LLC received the benefit of those monies. Counsel for the Defendants even went so far as to say, more than once, that the trial court "should grant a judgment" against the LLC for these monies received. Nevertheless, counsel for the Defendants maintained that Ms. McIntosh was not liable under her personal guaranty, either because she did not personally authorize advances or because someone other than her signed other underlying documents.

However, the language of the Commercial Guaranty agreements, admittedly executed by Ms. McIntosh, is exceedingly broad, giving her personal guaranty as to not only the loan connected to the particular Commercial Guaranty, but also as to "all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that [the LLC] owes or will owe [the Bank]." If it is conceded that the trial court "should grant a judgment" against the LLC for the amounts at issue, under any legal theory, then it is hard to see why Ms. McIntosh is not, *ipso facto*, liable under her personal guaranty.

Nevertheless, these statements by counsel for the Defendants appear to have been treated by the parties and by the trial court as mere argument instead of a stipulation of the LLC's liability for the amounts at issue. So we do the same in this appeal.

documents were enforceable contracts, finding that the FA Note "reaffirmed" the advances and the granting of security interests related to the ELOC because "Patricia McIntosh admittedly executed and delivered to Regions Bank . . . the Renewal Equipment Note [FA Note] and related documents." The trial court further stated: "While Patricia McIntosh testified that she did not read or review this Renewal Equipment Note [FA Note] package, Tennessee Law has long held that a person is charged with knowing the contents of Contracts which they sign, irrespective of whether they read the document or not."

On appeal, the Defendants argue that the FA Note and the FA Security Agreement are unenforceable for two reasons: (1) lack of consideration and (2) fraudulent inducement. We address each argument in turn.

### *Consideration*

The Defendants argue that the FA Note and FA Security Agreement were unenforceable for lack of consideration. They point out that the LLC received no funds in the transaction, the FA Note simply termed out the existing ELOC, and the LLC still owed the Bank the principal amount of $528,000.[22] They argue that the terms of the new FA Note were significantly more onerous than the terms of the ELOC in that, under the ELOC, the LLC's payments were interest-only, while the FA Note required payments comprised of both principal and interest over the five-year term. The Defendants also claim that, in executing the FA Security Agreement, the Bank received "the first authorized pledging" of the vehicles and the Excavator as collateral, and that the LLC received nothing in return for the pledge of this collateral. Because the Bank submitted no evidence of additional consideration to the LLC in exchange for the additional burdens placed upon it, the Defendants argue, the FA Note and the FA Security Agreement must fail for lack of consideration.[23]

Consideration is indeed a necessary element to the formation of a legal contract, and in general a contract that is unsupported by consideration is unenforceable. ***Campbell v. Matlock***, 749 S.W.2d 748, 751-52 (Tenn. Ct. App. 1987). Where the evidence is undisputed, the issue of "whether an act or forbearance constitutes consideration for a contract is a question of law." ***Bratton v. Bratton***, 136 S.W.3d 595, 601 (Tenn. 2004) (citing ***Applewhite v. Allen***, 27 Tenn. (8 Hum.) 697, 700, 1848 WL 1803 (Tenn. 1848); ***Estate of Hordeski v.***

---

[22]The actual amount due on the date the FA Note was signed was slightly over $528,000, but the FA Note was based on the $528,000 "rounded out" figure.

[23]For reasons that are not apparent, the Bank chose not to respond to the Defendants' argument on consideration in its appellate brief.

***First Fed. Sav. & Loan Ass'n of Russell County***, 827 S.W.2d 302, 304 (Tenn. Ct. App. 1991)).

A contract signed by the party sought to be bound creates a presumption that the contract was supported by consideration, and the burden to overcome this presumption is on the party asserting a lack of consideration. ***GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.***, 330 S.W.3d 166, 189 (Tenn. Ct. App. 2010) (quoting ***Toliver v. Wall***, No. M2006-00910-COA-R3-CV, 2007 WL 1890648, at \*2 (Tenn. Ct. App. June 28, 2007)). The bar is not high to find consideration to support a promise:

> "Any consideration, however small, will support a promise." ***Smith v. Riley***, No. E2001-00828-COA-R3-CV, 2002 WL 122917, at \*3 (Tenn. Ct. App. Jan. 30, 2002) (quoting ***Danheiser v. Germania Sav. Bank & Trust Co.***, 137 Tenn. 650, 194 S.W. 1094, 1096 (1917)). Courts "will not inquire into the adequacy or inadequacy of the consideration for a compromise fairly and deliberately made." ***Canonie Energy, Inc. v. King***, No. 03A01-9506-CH-00200, 1996 WL 87440, at \*6 (Tenn. Ct. App. Mar. 1, 1996) (quoting ***Thurmond v. Whittaker***, 1 Tenn. App. 111 (1925)). "It is well-settled that consideration exists when the promisee does something that it is under no legal obligation to do or refrains from doing something which it has a legal right to do." ***Brown Oil Co. v. Johnson***, 689 S.W.2d 149, 151 (Tenn. 1985); ***Pearson v. Garrett Fin. Servs., Inc.***, 849 S.W.2d 776, 779 (Tenn. Ct. App. 1992). "For there to be consideration in a contract between parties to the contract it is not necessary that something concrete and tangible move from one to the other. Any benefit to one and detriment to the other may be a sufficient consideration." ***Walker v. First State Bank***, 849 S.W.2d 337, 342 (Tenn. Ct. App. 1992) (citing ***Palmer v. Dehn***, 29 Tenn. App. 597, 198 S.W.2d 827, 828 (1946)).

***Id.*** at 188. Thus, any consideration is sufficient to support a promise and the finding of a contract. The bar is even lower for an agreement that, as here, modifies an existing contract. "Mutual consideration for the modification of an existing contract . . . is not always required." ***Id.*** at 190-91 (citations omitted, discussing exceptions to the rule requiring consideration for an agreed modification of an existing contract).

Here, the evidence shows ample consideration for the FA Note and the FA Security Agreement. While it is true that the ELOC only required the LLC to make monthly interest-only payments at a 8.25% rate, the Defendants' argument overlooks the fact that this was only for a one-year term, with the entire principal amount and unpaid accrued interest due as a balloon payment at the end of that term on March 30, 2008. In contrast, the payments under the FA Note were spread over a five-year term, with monthly payments comprised of

both principal and interest at a rate of 7.8%, for a fixed amount of principal that the LLC had already received. In and of itself, the obvious benefit to the LLC of relieving it of the obligation to make the substantial balloon payment in March 2008 is sufficient consideration. Moreover, the trial court was entitled to credit the testimony of Mr. Hill that the LLC requested this new arrangement so as to show the indebtedness as long-term debt on the company's year-end balance sheet; this shows an overall business benefit to the LLC as consideration for the FA Note and FA Security Agreement. As to Defendants' assertion that the FA Security agreement represented "the first authorized pledging" of the collateral, we reject this argument as well. Assuming, without deciding, that the evidence supported their assertion that the collateral at issue was not previously pledged, we review the agreements in their entirety, "not as separate, unrelated sets of promises." *Id.* at 193 (quoting *Anesthesia Med. Group, P.C. v. Chandler*, No. M2005-00034-COA-R3-CV, 2007 WL 412323, at \*6 (Tenn. Ct. App. Feb. 6, 2007)). For these reasons, we reject the Defendants' contention that the FA Note and FA Security Agreement, as renewed in the Modified FA Agreement, are unenforceable due to lack of consideration.

### *Fraudulent Inducement*

The Defendants argue next that the FA Note and the FA Security Agreement are invalid because Mr. Hill fraudulently induced Ms. McIntosh into signing the documents.[24] The trial court in this case noted that Ms. McIntosh "admittedly executed" the documents and found that she was "charged with knowing the contents" of the contracts that she signed, and made no finding that Mr. Hill fraudulently induced Ms. McIntosh into signing the FA Note and the FA Security Agreement.

In order to establish fraudulent inducement, sometimes called promissory fraud, the claimant has the burden of proving that the proponent of the contract (1) made a false statement concerning a fact material to the transaction (2) with knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) that the statement was reasonably relied upon, and (5) that an injury resulted from this reliance. *See Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 630-31 (Tenn. Ct. App. 2000). "Fraud is never presumed, and where it is alleged facts sustaining it must be clearly made out." *Homestead Group, LLC v. Bank of Tenn.*, 307 S.W.3d 746, 751 (Tenn. Ct. App. 2009).

---

[24]It is unclear whether the Defendants raised this issue prior to or during trial. However, in its motion to alter or amend the judgment, the Defendants argued that the trial court erred in failing to find that Ms. McIntosh was fraudulently induced into signing the FA Note and FA Security Agreement. We will address the argument in this portion of the analysis, although it is arguable that it should be addressed in the context of the trial court's denial of the motion to alter or amend.

Thus, the burden was on the Defendants to prove that Ms. McIntosh was fraudulently induced into signing the FA Note and the FA Security Agreement.

As evidence to support their claim of fraudulent inducement, the Defendants cite to Mr. Hill's description of the December 2007 meeting. Mr. Hill testified that, before Ms. McIntosh signed each document, he asked her if she would like for him to go over the details of the document, rather than reading the document that she was being asked to sign. In doing so, the Defendants assert, Mr. Hill committed fraud, because "he never discussed with Patricia McIntosh that some third person had signed her name to numerous documents" related to the ELOC. They claim that Mr. Hill affirmatively represented to Ms. McIntosh that the items of collateral in the FA Security Agreement had been funded by the ELOC, pointing to Ms. McIntosh's testimony that she had no knowledge whatsoever of the three unauthorized addenda to the ELOC that pledged the vehicles and Excavator as collateral. Thus, the Defendants argue, Ms. McIntosh "relied on Mr. Hill's concealment, omissions and material misrepresentations" in signing the FA Note and FA Security Agreement.[25]

From our review of the record, the evidence does not support a finding of fraudulent inducement in this case. The Defendants rely primarily on Mr. Hill's testimony that he did not inform Ms. McIntosh that the collateral listed on the FA Security Agreement had not been purchased by the ELOC. Ms. McIntosh acknowledged, however, that she saw the items listed on the FA Security Agreement when she signed it, and that she assumed those items had been funded by the ELOC. Assuming Ms. McIntosh did not authorize the advances to purchase the collateral, she knew this at the December 2007 meeting when she was asked to sign the FA Note and the FA Security Agreement, and yet she did not inquire about how the collateral came to be purchased with ELOC funds without her authorization. Also, Mr. Hill testified that he believed that Ms. McIntosh had authorized the ELOC advances in order to fund the purchase of these items of collateral. The trial court below credited Mr. Hill's testimony. Overall, the evidence in the record falls far short of constituting the "clear" evidence necessary to sustain a claim of fraudulent inducement.

In sum, we reject the Defendants' arguments that the FA Note and FA Security Agreement are unenforceable based on lack of consideration or fraudulent inducement. Therefore, these contracts are enforceable as written. Because the FA Note is enforceable, the Modified FA Note is also enforceable as a renewal of that note.

_____

[25]For reasons that are not apparent, the Bank chose not to respond to the Defendants' argument that Ms. McIntosh was fraudulently induced into signing the FA Note and FA Security Agreement.

## Ratification

The Defendants argue that the trial court erred in upholding the Bank's security interest in the Bentley, the 2008 Ford Truck, and the Excavator, based on a finding that the LLC ratified the allegedly unauthorized ELOC advances to purchase these items. They also argue that the trial court erred in holding them liable for the $400,000 advance on the AR Note based on its finding that this advance, even if unauthorized by Ms. McIntosh, was ratified by the LLC. Before addressing these contentions, a review of the doctrine of ratification is helpful in understanding the analysis.

A fundamental principle of agency law is that a principal is neither bound by a contract made by a person who is not his agent, nor by a contract made by an agent who acted beyond the scope of the agent's authority, absent a valid ratification by the principal. *See Bells Banking Co. v. Jackson Ctr., Inc.*, 938 S.W.2d 421, 424-25 (Tenn. Ct. App. 1996). "Ratification is the express or implied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another who assumed to act as his agent without authority so to do." *Gay v. City of Somerville*, 878 S.W.2d 124, 127 (Tenn. Ct. App. 1994) (quoting *Bagley & Co. v. Union Buffalo Mills Co.*, 9 Tenn. App. 63, 68 (Tenn. Ct. App. 1928)). Stated another way, "[r]atification of a contract occurs when one approves, adopts, or confirms a contract previously executed 'by another[,] in his stead and for his benefit, but without his authority.'" *Monumental Life Ins. Co. v. Puckett*, No. W2005-00083-COA-R3-CV, 2006 WL 44037, at *3 (Tenn. Ct. App. Jan. 9, 2006) (quoting *Webber v. State Farm Mut. Auto Ins. Co.*, 49 S.W.3d 265, 269-70 (Tenn. 2001) (quoting *James v. Klar & Winterman*, 118 S.W.2d 625, 627 (Tex. Ct. App. 1938))).

Under the doctrine of ratification, "where a party with full knowledge of the facts involving him in liability acquiesces in what has been done, he thereby sanctions it; and silence and inaction on his part in such a case, after a reasonable time, will amount to a ratification, and make him liable." *Thornton v. Allenbrooke Nursing and Rehab. Ctr., LLC*, No. W2007-00950-COA-R3-CV, 2008 WL 2687697, at *8 (Tenn. Ct. App. July 3, 2008) (quoting *Fite v. Wiel*, 46 S.W. 330, 334 (Tenn. Ct. App.1898) (quoting *Winham v. Crutcher*, 78 Tenn. 610, 615 (1882))). Generally, "full knowledge" by the principal requires knowledge "of all material facts and circumstances relative to the unauthorized act or transaction." *Id.* (quoting *Monumental Life Ins.*, 2006 WL 44037, at *3 (quoting *Gough v. Ins. Co. of N. Am.*, 157 Tenn. 546, 549-50, 11 S.W.2d 887 (1928)). Thus, in order to establish ratification of an unauthorized contract, the proponent of the contract must establish "(1) [a]cceptance by the principal of the benefits of the agent's act; (2) *with full knowledge of the facts* and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangement." *Bells Banking*, 938 S.W.2d at 427 (emphasis added) (quoting 2A C.J.S. *Agency* § 71).

Ratification "is usually a question of the principal's intent, an issue that is generally regarded as a question of fact to be determined from the surrounding circumstances." ***Harber v. Leader Fed. Bank for Sav.***, 159 S.W.3d 545, 552 (Tenn. Ct. App. 2004) (citing ***Webber v. State Farm Mut. Auto. Ins. Co.***, 49 S.W.3d 265, 270 (Tenn. 2001)). However, the Court may find ratification as a matter of law, without regard to the principal's intent, if the principal's actions are justifiable only if there is ratification:

> Because ratification is a function of the principal's intent, it is a question of fact. ***Webber v. State Farm Mut. Auto. Ins. Co.***, 49 S.W.3d 265, 270 (Tenn. 2001). Yet, when the actions of the principal evidence an intent to ratify the unauthorized act or are justifiable only if there is a ratification, a court may find that ratification has occurred as a matter of law. ***Id.*** Under such a circumstance, the question of whether the principal contemplated ratification may become immaterial so long as the principal pursues this course of conduct with full knowledge of the facts relevant to the unauthorized acts. ***See id.***

***Harber v. Bank of Am., N.A.***, 274 S.W.3d 649, 655 (Tenn. Ct. App. 2008).

In the instant case, although the LLC is the party that is bound to the contracts at issue, Ms. McIntosh is the only person who had the "power to enter into the [contracts] in question." The issue becomes whether she had the "full knowledge of material circumstances" when she and the LLC took actions that could be deemed as ratifying the allegedly unauthorized transactions.[26]

### *Ratification of the Advances Under the ELOC*

As noted above, the FA Note and the FA Security Agreement, as renewed in the Modified FA Note, were not fraudulently induced and are enforceable as written. These documents, admittedly signed by Ms. McIntosh, bound the LLC to repay the $528,000 borrowed under the ELOC and again pledged the same collateral that was the subject of the allegedly unauthorized advances — the Bentley, the 2008 Ford Truck, and the Excavator. These contracts stand alone, and they were clearly intended to supplant any prior agreements regarding the monies advanced to purchase this collateral and regarding the pledge of this collateral to secure the debt. Consequently, we need not determine whether the act of signing these documents constituted a ratification of the ELOC.

---

[26]This does not mean that Ms. McIntosh is the principal for all issues related to ratification involving the LLC. Another officer or agent of the LLC could be found to have ratified a transaction on behalf of the LLC if that officer or agent had the necessary authority to enter into the transaction in the first instance.

Therefore, the Bank has obtained a valid security interest in the Bentley, the 2008 Ford Truck, and the Excavator by virtue of the FA Note and the FA Security Agreement, and not by virtue of any ratification of the allegedly unauthorized advances. We therefore affirm the trial court's decision in this respect, albeit on a different basis.

### *Ratification of the Advance under the AR Note*

The Defendants also argue that the trial court erred in holding them liable for the $400,000 advanced under the AR Note. At trial, Bank officer Mr. Hill testified that Ms. McIntosh expressly authorized a $500,000 advance under the AR Note at the December 2007 meeting, and that this was subsequently reduced to $400,000 by the LLC's acting CFO. The trial court did not make an express finding that Ms. McIntosh authorized the $400,000 draw. Rather, it determined that the LLC "affirmatively and unequivocally ratified the allegedly unauthorized A/R Note advance" by accepting the benefits of the advance and making monthly payments thereon. The trial court noted the undisputed evidence that the $400,000 was deposited into the LLC's bank account, the LLC made payments on the $400,000 loan from February 2008 through January 2009, and no person at the LLC ever complained or objected to the $400,000 advance until after this lawsuit was filed.

As noted above, ratification can occur only if the principal has full knowledge of the unauthorized acts of the agent. Here, the obligor under the AR Note is the LLC, a legal entity rather than a person. In such a situation, whose "knowledge" is at issue for purposes of ratification? In the case of a legal entity such as a corporation, if a proponent of such a contract asserts that the corporation ratified the contract by its conduct, the proponent must show that "the necessary knowledge of material facts [was] brought home to the corporate board or to the officers who would have had power to enter into the transaction in question." 18B Am. Jur. 2d *Corporations* § 1423. In this case, the "knowledge" of the LLC must necessarily reside in a person or persons with the power to authorize the $400,000 advance under the AR Note. From the evidence, that person would be Ms. McIntosh or someone authorized by Ms. McIntosh.

Here, based on the evidence, the trial court could have made an express finding that Ms. McIntosh either verbally authorized the $400,000 advance under the AR Note or had knowledge that the LLC had received the $400,000 advance from the Bank and ratified the advance by remaining silent while the LLC made payments on this advance for almost a year.[27] It did not. Instead, the trial court relied on the fact that the LLC undeniably received

---

[27]Certainly there is sufficient evidence in the record to support a finding that Ms. McIntosh authorized the $400,000 advance to the LLC when she signed the AR Note. Mr. Hill testified in some detail that the LLC

(continued...)

the benefit of the advance, without making an express determination that Ms. McIntosh had knowledge of the relevant facts. This is insufficient to support a finding of ratification.

As we have stated, the trial court did not make a finding on whether Ms. McIntosh in fact either authorized or knew about the $400,000 advance under the AR Note. We are unwilling to make a determination on either of these specific issues from this vantage point, as they involve weighing the credibility of the witnesses. Consequently, we must remand the cause to the trial court for specific factual findings on whether Ms. McIntosh authorized the $400,000 advance under the AR Note, as Mr. Hill testified. If the trial court finds that Ms. McIntosh did not authorize the advance, it must determine whether Ms. McIntosh had sufficient knowledge of material facts regarding the LLC's receipt of the $400,000 advance and ratified the advance by remaining silent for almost a year while the LLC made payments on this loan.

### Perfected Security Interest in the Bentley and the 2008 Ford Truck

The Defendants argue that the trial court erred in finding that the Bank has a perfected security interest in the Bentley and the 2008 Ford Truck. It first argues that the FA Note was a refinancing, not a renewal, of the ELOC, and that consequently the Bank was required to release any lien it held on the vehicles and refile the necessary documents to obtain a new lien. The Defendants next argue that the Bank did not have a perfected security interest, because Ms. McIntosh's signature on the documents creating the Bank's security interest was forged, and therefore they could not create a valid perfected security interest. Finally, the Defendants argue that the Bank could not have a perfected security interest in the Bentley because the Bentley is owned by Ms. McIntosh, not the LLC. This is significant, they argue, because the certificate of title on the Bentley does not "bear the signature of the owner," and because the LLC cannot pledge as collateral something that it does not own. We will address these issues below.

---

[27](...continued)

requested that the AR Note be executed before the year end, so that the LLC could take a draw and bolster the liquidity of the LLC on its balance sheet. On the day that the AR Note was signed by Ms. McIntosh, Mr. Hill stated, Ms. McIntosh verbally authorized an immediate draw of the entire $500,000, but the next day this amount was reduced to $400,000 by Mr. Bower. The advance would have been made contemporaneously with the signing, Mr. Hill said, but the decision was made to advance the funds one or two days later to save the LLC some interest. Also, in April 2008, it is undisputed that Ms. McIntosh drew $100,033 from the AR Note line of credit, and that this amount correlated exactly with the amount remaining of the total $500,000 available under the AR Note. Given the amount "remaining," it is reasonable to infer that Ms. McIntosh was aware that the first $399,967 had already been drawn by the LLC. The resolution, however, depends on the trial court's assessment of the credibility of the witnesses.

### *Failure to Release Lien and Refile a New UCC-1 Financing Statement*

The Defendants argue that the FA Note, or "Renewed Equipment Note" as characterized by the trial court, was not actually a renewal of the ELOC at all. Rather, they contend, it was a refinancing. This distinction is important, the Defendants argue, because the ELOC was "paid in full and discharged" by virtue of the refinancing, and so the Bank was required to release any lien it held on the vehicles at the time of refinancing pursuant to Tennessee Code Annotated § 66-25-101(a).[28] In addition, the Bank was required to again comply with Tennessee Code Annotated §§ 55-3-101, *et seq.*, that is, to perfect a new lien on the vehicles, and to record a new UCC-1 financing statement to perfect any new security interest in the vehicles.

While the Defendants have in general argued that the Bank did not have a perfected security interest in the vehicles, they did not argue to the trial court that the Bank's security interest was not perfected because of the Bank's failure to release the first lien under Section 66-25-101(a) and refile under Section 55-3-101, *et seq.*[29] When an issue on appeal was not raised in the trial court, we will not address it for the first time on appeal. ***Sparks v. Metro. Gov't of Nashville & Davidson County***, 771 S.W.2d 430, 434 (Tenn. Ct. App. 1989). Therefore, we decline to address whether the Bank's security interest fails based on its failure to release its lien under the ELOC and refile under the FA Note.

### *Forged Signatures*

The Defendants argue that Bank's security interest in the vehicles was not perfected because Ms. McIntosh's name was "forged" on the six documents related to the advances made under the ELOC. They point out that a lien on a motor vehicle is perfected only upon compliance with Tennessee Code Annotated § 55-3-101, *et seq.* Because the documents creating the security interest in the vehicles were "forged," the Defendants contend, the security interest cannot be deemed valid.

In response, the Bank claims that, to perfect its security interest, it needed only to have a valid security agreement with the LLC, and to have its lien noted on the certificates of title to the vehicles. It notes that the FA Security Agreement was a valid security agreement, and

---

[28]That statute provides that when a debt "has been fully paid or satisfied," the debt holder "must satisfy the record by a formal deed of release." Tenn. Code Ann. § 66-25-101(a).

[29]In its memorandum of law in support of its motion to amend, the Defendants do point out that the ELOC and the FA Note have distinctly different terms. This point was made, however, in the context of their argument that the FA Note did not constitute a ratification of the ELOC.

that the Bank's liens were noted on the original certificates of title for both vehicles. Therefore, the Bank maintains, it properly perfected its security interest in the vehicles.

We agree with the Bank that it took the necessary steps to perfect its security interest in the vehicles. The relevant statute provides:

> A security interest or lien is perfected by delivery to the department or the county clerk of the existing certificate of title, if any, title extension form, or manufacturer's statement of origin and an application for a certificate of title containing the name and address of the holder of a security interest or lien with vehicle description and the required fee.

Tenn. Code Ann. § 55-3-126(b)(1) (2008); *see Keep Fresh Filters, Inc. v. Reguli*, 888 S.W.2d 437, 445 (Tenn. Ct. App. 1994). Here, as to both vehicles, the application for noting a lien on the certificate of title was filed on June 19, 2007. Title to both vehicles was issued on June 21, 2007. As to both vehicles, the certificate of title bears the name of "Bric Constructors LLC" as the owner,[30] and both certificates of title list the Bank as the first lienholder. Thus, the certificates of title are perfected pursuant to the requirements of the statute.

The issue becomes whether this otherwise perfected security interest is invalidated by the alleged "forgeries" on the six documents that relate to the creation of the Bank's security interest, namely, the two applications for noting the Bank's lien on the certificates of title, the two POAs, and the two addenda to the ELOC Security Agreement. The Defendants cite no caselaw in support of their argument that the alleged "forgeries" invalidate the Bank's security interest, but argue:

> If parties in Tennessee were allowed to engage in such conduct in order to perfect a first lien security interest, then anyone who gains possession of an automobile title could falsify a security agreement and application to note a lien on the title and submit such documents to the State and obtain a lien on a title.

In our view, the evidence in the record does not support the Defendants' claim that the relevant documents were "forged." Under Tennessee Code Annotated § 39-14-114(a), a person commits forgery when he or she "forges a writing with intent to defraud or harm another." Tenn. Code Ann. § 39-14-114(a); *Bd. of Prof. Responsibility v. Curry*, 266 S.W.3d 379, 393 (Tenn. 2008) (observing that "forgery" is not defined in the UCC, but that

---

[30]We address below whether Ms. McIntosh is the true owner of the Bentley.

"courts look to the definition of the offense in the criminal code" in determining whether it exists). "[A] necessary element of the act of forgery is an intent to defraud. The fact that a signature or endorsement is unauthorized does not necessarily establish it as a forgery unless there is also evidence of an intent to defraud." *Curry*, 266 S.W.3d at 393 (citations omitted).

The trial court credited the testimony of Mr. Hill and handwriting expert Jane Eakes that Mr. McIntosh signed Ms. McIntosh's name to the documents in question. The trial court also expressly credited the testimony of witnesses who stated that, regardless of the LLC's Resolution stating that Ms. McIntosh was the only person with authority to engage in financial transactions on behalf of the LLC, Mr. McIntosh was in fact the person who handled the LLC's financial decisions. Thus, the clear preponderance of the evidence credited by the trial court supports a finding that Mr. McIntosh was, in fact, the person who signed the documents in question.

From a careful review of the record, we find that there is no indication that Mr. McIntosh signed Ms. McIntosh's name the relevant documents for personal gain or for a fraudulent purpose.[31] Rather, the evidence shows that Mr. McIntosh did so in order to complete the loans, obtain financing, and to generally further the business of the LLC. Therefore, we reject the Defendants' argument that the Bank's security interest in the vehicles was not perfected based on the "forgery" of Ms. McIntosh's name on the six documents related to the advances made under the ELOC.

Thus, we find no error in the trial court's holding that the Bank had a perfected security interest in the Bentley and in the 2008 Ford Truck.

### Patricia McIntosh Owned the Bentley

In the context of its discussion on ratification, the trial court below held:

> As a matter of law, a ratification of the Equipment Note [ELOC], the A/R Note and the Lease occurred in this case.
>
> The ratification includes the McIntoshs' purchase of the Bentley automobile. *It cannot be disputed that this was Patricia McIntosh's personal automobile* and cannot be labeled as construction equipment. However, the overriding equity of the case requires this Court to hold the McIntoshs responsible for the

---

[31]The record contains no evidence of intent to defraud or commit "forgery" in the signing of Ms. McIntosh's name, regardless of who actually signed the documents.

Bentley since Patricia McIntosh derived the benefit of its use because it was purchased . . . with Regions Bank's money.

(Emphasis added). Based on the italicized portion of this passage, the Defendants argue, the trial court in effect found that Ms. McIntosh was the true owner of the Bentley because it was her "personal automobile." They argue that this fact is significant because (1) the certificate of title is flawed because it does not "bear the signature of the owner" (see Section 55-3-103(a)), and (2) the LLC could not pledge as collateral property it did not own.

We disagree with the Defendants' interpretation of the trial court's order. The trial court's observation that the Bentley was used as Ms. McIntosh's "personal automobile" and was not "construction equipment" does not equate to a holding that Ms. McIntosh, rather than the LLC, was the actual "owner" of the Bentley. Rather, the trial court was merely acknowledging the obvious fact that the Bentley was intended for Ms. McIntosh's personal use, rather than for a business purpose. The Bentley has at all times been titled in the name of the LLC, so the notation of "Bric Constructors LLC" as the owner on the Bentley's certificate of title is accurate. Therefore, we find that this argument is without merit.

### Security Interest in the Excavator

The trial court held that the Bank had a valid perfected security interest in the Excavator:

> While Regions Bank certainly could have been more detailed in describing the Excavator which had been pledged to Regions Bank by Bric, LLC, the Court nonetheless finds Regions Bank's description in both its Security Agreement(s) and its UCC Filings were sufficient under Tenn. Code Ann. § 47-9-108, to identify the property in which Regions Bank claimed a Lien. While the description in Regions Bank's second UCC Filing does not include the make, model or the serial number, the description does indicate it was for one (1) Hydraulic Excavator with specific attachments (a Hammer and an HD Bucket). This description is sufficient for purposes of Tenn. Code Ann. § 47-9-108, because Tennessee does not require that serial numbers be utilized in such descriptions. Further, the proof at trial indicated that as between Regions Bank and Bric, LLC, its customer, there was no confusion as to which Excavator had been pledged to Regions Bank. This was shown based on the July 11, 2007, Power Equipment invoice for the Excavator faxed to Regions Bank by Bric, LLC (Trial Exhibit 21) and by the August 30, 2007, Insurance Certificate naming Regions Bank as loss payee for this Excavator under Bric, LLC's insurance policy (Trial Exhibit 3), wherein the Excavator was described by make and serial number. The Court also finds that per Regions Bank's

Security Agreements, these records are to be considered "related documents" which were incorporated by reference in Regions Bank's Security Agreements with Bric, LLC.

Thus, the trial court held that the description of the Excavator in the FA Security Agreement and UCC-1 filings was sufficient under Section 47-9-108 for the Bank to establish and perfect its security interest in that piece of equipment.

On appeal, the Defendants argue that (1) the Bank does not have a valid security interest in the Excavator because it was insufficiently described in the FA Security Agreement, and (2) the Bank's security interest in the Excavator is not perfected because it was insufficiently described in the UCC-1 filings. In order to address these arguments, we must briefly review the relevant statutes.

Under the UCC, a security interest is enforceable against the debtor and third parties if "the debtor has authenticated a security agreement that provides a description of the collateral . . . ." *In re U.S. Ins. Group, LLC*, 429 B.R. 903, 911 (E.D. Tenn. 2010) (quoting Tenn. Code Ann. § 47-9-203(b)). The "description of the collateral" must meet the guidelines set forth in Tennessee Code Annotated § 47-9-108 in order for the security agreement to be valid:

> (a) SUFFICIENCY OF DESCRIPTION. Except as otherwise provided in subsections (c), (d), (e) and (f), a description of personal or real property is sufficient, whether or not it is specific, if it *reasonably identifies* what is described.
> (b) EXAMPLES OF REASONABLE IDENTIFICATION. Except as otherwise provided in subsection (d), a description of collateral reasonably identifies the collateral if it identifies the collateral by:
> > (1) specific listing;
> > (2) category;
> > (3) . . . a type of collateral defined in the Uniform Commercial Code;
> > (4) quantity;
> > (5) computational or allocational formula or procedure; or
> > (6) . . . any other method, if the identity of the collateral is objectively determinable.

Tenn. Code Ann. § 47-9-108(a), (b) (emphasis added). Under the plain language of this statute, the description of collateral is sufficient if it "reasonably identifies what is described." The Official Comment to Section 47-9-108 states that the test is whether the description does the job assigned to it, that is, to "make possible the identification of the

collateral described." *Id.*, cmt. 2. The Comment clarifies that the section does not require that the collateral be "exact and detailed (the so-called "serial number" test)." *Id.*

In order to perfect a security interest, the secured party must file a UCC-1 financing statement that "indicates the collateral covered by the financing statement." Tenn. Code Ann. § 47-9-310; § 47-9-502(a).[32] Tenn. Code Ann. § 47-9-502(a). The question of whether the financing statement "sufficiently indicates the collateral that it covers" is determined by reference to the same guidelines in Section 47-9-108 quoted above; in other words, it must "reasonably identify what is described." Tenn. Code Ann. § 47-9-504. Although the description of the collateral in a security agreement and the description in the UCC-1 financing statement are evaluated under the same guidelines, the requirements for the description in a security agreement are stricter than the requirements applicable to financing statements, because a security agreement expresses the intent of the parties, while the purpose of a UCC-1 financial statement is simply to provide sufficient notice to third parties to instigate further inquiry. *See, e.g., First Bank v. E. Livestock Co.*, 837 F. Supp. 792, 802 & n.15 (S.D. Miss. 1993) (citing *In re Turnage*, 493 F.2d 505, 506 (5th Cir. 1974)); *Prod. Credit Ass'n v. Bartos*, 430 N.W.2d 238, 240 (Minn. Ct. App. 1988).

Given these guidelines, we agree with the trial court that the descriptions of the Excavator in the FA Security Agreement and in the UCC-1 filings "reasonably identified" this collateral. The FA Security Agreement described the collateral as a "Hydraulic Excavator w/ Tramac V1600 Hammer Eq. #C0442 and a 36" HD Hensley Bucket Stock #A6775." Similarly, the August 2, 2007 UCC-1 statement described it as "One Hydraulic Excavator with Tramac V1600 Hammer, Eq. #C0442 and a 36" Hensley Bucket Stock #A6775." We agree with the trial court that the parties were not confused about which "Hydraulic Excavator" was covered by the FA Security Agreement. In addition, the description of the Excavator in the UCC-1 filing was sufficient to put an interested party on notice of the Bank's lien. "Further inquiry from the parties concerned [would] be necessary to disclose the complete state of affairs." *King v. Hamilton First Bank (In re King)*, 30 B.R. 2, 3 (Bankr. E.D. Tenn. 1983) (quoting comment 2 of Section 47-9-402 (1979). For these reasons and for the reasons stated by the trial court, we affirm the trial court's holding that the Bank had a valid security interest in the Excavator and that the security interest held had been properly perfected.

### CONCLUSION

The decision of the trial court is affirmed in part and reversed in part as set forth above, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal

---

[32]The statement must also contain the name of the debtor and the name of the secured party or its representative. Tenn. Code Ann. § 47-9-502(a).

are to be taxed to Appellants Bric Constructors, LLC, d/b/a Bric Contractors, LLC, and Patricia McIntosh, and their sureties, for which execution may issue, if necessary.


_____

HOLLY M. KIRBY, JUDGE