IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 21, 2012 Session

## TOMMY HINTON and wife, JEAN MARIE HINTON v. JERRY L. EDMONDS and wife, SUSAN D. EDMONDS

**Direct Appeal from the Chancery Court for Hardin County**
**No. 7460      James F. Butler, Chancellor**

_____

**No. W2011-01392-COA-R3-CV - Filed May 7, 2012**

_____

Adjoining property owners dispute the validity of an Agreement which placed restrictions upon a roadway across one property which provided access to the other property. The trial court, after making specific factual findings, found the Agreement invalid and non-binding upon the parties. We affirm the trial court's factual findings as well as its ultimate determination of invalidity.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

J. Gilbert Parrish, Jr., Savannah, Tennessee, for the appellants, Jerry L. Edmonds and wife, Susan D. Edmonds

Terry Abernathy, Selmer, Tennessee, for the appellees, Tommy Hinton and wife, Jean Marie Hinton

## OPINION

### I. FACTS & PROCEDURAL HISTORY

The parties in this case are adjoining landowners. In 1993, Tommy and Marie Hinton purchased, as tenants by the entirety,[1] unimproved Lot #23 in the Lakeshore Estates Subdivision in Hardin County, Tennessee, from Paul Callens and Ron Harmon d/b/a C & H Development Company. The Hintons' lot remains unimproved.

The Hintons' property partially borders a public road; however, access from this road has been described as "unusable" or "unreasonable" due to the existence of a deep ravine. Thus, in 1997, the Hintons, at their own expense, had a roadway and "turnaround" cut and graveled across adjoining Lot #31 to access their own lot. At the time the roadway was constructed, Lot #31 was owned by Ron Harmon, who consented to, and was present at, the roadway construction.

In 1996 or 1997, Ron Harmon had a personal residence constructed on Lot #31. In 2001, he sold the residence on Lot #31 to Jerry and Susan Edmonds. A Warranty Deed was recorded on August 1, 2001, which recited the following relevant encumbrance:

> the same is unencumbered except by . . . an easement for a driveway and turnaround for the benefit of Lot 23, Lake Shore Estates, Phase I, along the southern and western boundaries of Lot 31, and this conveyance is made subject to all of the same.

It is undisputed that when the Edmonds purchased Lot #31 the roadway across the property was "plainly visible" and "plainly graveled." In fact, Mr. Edmonds concedes that he "understood that [the roadway] was there for the owners of the lot next to [his] to use."

Between 1997 and 2007, the Hintons used the roadway across Lot #31, without objection, to periodically access their own property. In 2007, the Hintons decided to move to Nashville, necessitating the sale of both their home in Cordova and their lot in Lakeshore Estates. The parties first met when the Hintons visited the Edmonds' home to notify them of their decision to sell their lot.

---

[1]A conveyance to a married couple–silent as to the type of ownership–creates a presumption of a tenancy by the entirety. *Dickson v. Long*, No. M2008-00279-COA-R3-CV, 2009 WL 961784, at *13 (Tenn. Ct. App. Apr. 8, 2009) (citing *In re Estate of Russell*, No. 01A01-9611-PB-00516, 1997 WL 249961, at *7 (Tenn. Ct. App. May 14, 1997); *Bost v. Johnson*, 175 Tenn. 232, 133 S.W.2d 491 (1939); *Young v. Brown*, 136 Tenn. 184, 188 S.W. 1149 (1916)).

Following his first meeting with the Hintons, Mr. Edmonds reviewed his Warranty Deed and the included easement reservation. Based upon his belief that the easement described in the Warranty Deed did not match the roadway's actual location, Mr. Edmonds proposed to Mrs. Hinton that "it would probably be in both of our best interest[s] to get it descripted [sic], platted and laid out and move the easement up to equate to where the driveway is." Thus, in February 2008, Mr. Edmonds sent Mrs. Hinton a proposed set of "easement rules," which limited the easement's use to ingress and egress only and which required the Hintons to bear the costs of a survey, any improvements or maintenance to the roadway, and the drafting and recordation of any agreement reached.

The Hintons had the easement surveyed in March 2008 and Mrs. Hinton and Mr. Edmonds continued to have "very sporadic" discussions regarding the proposed agreement. In April 2009, Mr. Edmonds recorded an "Ingress/Egress Easement" signed only by Mr. and Mrs. Edmonds, because the Hintons had not yet agreed to its contents, and because he "wanted to make sure that . . . [the Hintons'] selling agent knew there was an issue with the easement."

According to Mrs. Hinton, the Hintons were "under a lot of financial pressure" and "desperately needed to sell the[ir] property" in order to finance their home under construction in Nashville. Thus, to avoid "any problems with selling the lot[,]" Mrs. Hinton ultimately signed an "Ingress/Egress Easement Agreement" (the "Agreement") on November 17, 2008. She also claims that she signed Mr. Hinton's name to the Agreement without his permission and against his wishes. The Agreement acknowledged a permanent easement across Lot #31 for ingress and egress purposes, only, expressly prohibiting parking vehicles or placing recreational equipment thereon. It further provided that: 1) any improvements to the easement must be completed by a licensed engineer approved by the owners of Lot #31; 2) any improvements to the easement must be completed prior to the commencement of construction on Lot #23; 3) any construction of a residential dwelling on Lot #23 must be completed within 18 months of construction commencement; and 4) the owners of Lot #23 must bear the cost of any easement construction, improvements, or maintenance. Finally, the Agreement provided that if the owners of Lot #23 violate the above-stated provisions, with the exception of the ingress/egress access only provision, that the owners of Lot #31 may revoke the Agreement.

Upon execution, Mrs. Hinton forwarded the Agreement to Mr. Edmonds' attorney, as requested; however, the document "fell through the cracks" and Mr. Edmonds did not learn of its execution until the summer of 2009, when he spoke to Mrs. Hinton regarding his opposition to her plan to re-gravel the roadway. Upon discovering execution, both Mr. and Mrs. Edmonds signed the Agreement in July 2009 and Mr. Edmonds had it recorded in September 2009.

In November 2009, the Hintons filed a Complaint seeking to have the Agreement declared a nullity and further seeking "full and unrestricted use of the involved Easement[.]" Specifically, the Hintons challenged the Agreement's validity based upon their contention that Mrs. Hinton had signed Mr. Hinton's name to the Agreement without his "knowledge or permission or authority" and contrary to his "advice and position," and based upon the alleged lack of consideration to support it. Additionally, they argued that the Edmonds had unreasonably denied their request to re-gravel the roadway, rendering it "virtually useless" and "potentially hazardous and dangerous[,]" and "depriving them of any reasonable opportunity to market their property for sale to any third party."

The matter was heard before the Hardin County Chancery Court on March 14, 2011, Chancellor James F. Butler presiding.[2] On April 26, 2011 the trial court entered its written ruling, which provided in relevant part:

> Mr. Hinton did not agree with the proposal and he would not sign it, nor give his permission for his wife to sign it for him, nor was he aware when it was actually signed. Mrs. Hinton signed the agreement with her and her husband's name[s] on November 14, 2008[,] and it was notarized by a notary in Shelby County, Tennessee, on November 17, 2008. . . .
>
> . . . .
>
> The facts are that Mrs. Hinton signed the agreement [a]ffecting a property right owned by her and her Husband as tenants by the entirety, to wit, the agreement. Mr. Hinton did not sign the agreement the Court finds, nor did he consent to it. There was no testimony to the contrary. Mr. Hinton[,] in fact, expressed his dissatisfaction with the proposal to his Wife. Mrs. Hinton signed the agreement anyway. Her claim is that she was under financial pressure to get the agreement signed so the Hintons could sell their lot. Mrs. Hinton is not a sophisticated business person. It is disputed as to whether or not she was under pressure and also as to whether or not she had the ability to sign Mr. Hinton's name through a power of attorney. The Court finds that her reasoning for signing the agreement is not a valid reason to justify voiding the agreement. The Court also finds that any power of attorney she might have had was not effective to authorize her to sign the Husband's name over his stated objection. Superimposed on this act of signing her Husband's name is the fact that Mrs. Hinton notified Mr. Edmonds of this fact before the Edmonds signed the agreement. She asked him not to record the agreement.

---

[2]Chancellor Ron Harmon recused himself from the case.

Edmonds at first denied Mrs. Hinton told him she had signed her Husband's name, but admitted that in his earlier deposition, he testified that he did not recall her saying that. He did not deny it in his deposition. He admitted further that he does investments in real estate through his own company. Mr. Edmonds does have experience in dealing with real estate and contracts.

Once Mrs. Hinton told Mr. Edmonds of the act of her signing her Husband's name to the contract without his consent, and requested that he not record it, it was in effect a withdrawal of the offer to be bound by the contract and Edmonds at that point had no power to put withdrawal of the contract out of the reach of Mrs. Hinton. His act of signing it after receiving this information from her is not sufficient to constitute an acceptance. At that point, the Edmonds' power to accept the contract no longer existed.

Further, the Court notes that there was no evidence that the Edmonds relied upon the contract to their detriment, that they have lost any money or rights they might have had prior to the agreement. Basically, everyone is back where they started from without the agreement. Neither party has profited or suffered a loss by the invalidation of the agreement.

Based on the foregoing, and the entire record in this case, the Court finds that the agreement . . . is not valid and does not bind any of the parties to its terms.

The trial court then noted that the easement roadway is usable in its current condition and that the Edmonds "have no problem with its use in its current condition without additional work or maintenance on it." The court acknowledged that the easement reservation in the Edmonds' Warranty Deed did not fully match the roadway's actual location–"[the roadway] does not fully track the western and southern boundaries."–and that the parties desire the terms of the easements's use, maintenance, etc. be set. However, based upon the insufficient information before it, the trial court declined to make any further rulings, instead encouraging the parties to "work out an agreement on their own." A Final Order was entered on May 6, 2011.

## II.  ISSUES PRESENTED

The Edmonds present the following issues for review, as summarized:

1.   Whether the trial court erred in making factual findings contrary to the testimony of "credible" witnesses and contrary to the clear and convincing evidence presented;

2.   Whether the trial court erred in finding that the Agreement did not bind the parties; and

3.   Whether the trial court erred in finding that the Hintons possessed any easement rights by virtue of their deed.

For the following reasons, we affirm the decision of the trial court.

## III.  STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d) (2010)**; *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond*, 521 S.W.2d 806, 808 (Tenn. 1975)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### *A. Factual Findings*

First, we address the Edmonds' argument that the trial court made numerous factual findings contrary to the weight of the evidence. Specifically, the Edmonds allege the following findings were erroneous: 1) that Mrs. Hinton signed Mr. Hinton's name to the Agreement; 2) that Mrs. Hinton told Mr. Edmonds that she signed Mr. Hinton's name to the Agreement; 3) that Mrs. Hinton asked Mr. Edmonds not to record the Agreement; and 4) that Mr. Edmonds "does investments in real estate and contracts."[3]

Mr. Hinton is an independent towboat pilot whose occupation requires him to spend extensive time away from home. Due to his extended absences, Mrs. Hinton has had, and utilized, many powers of attorney over Mr. Hinton during the past thirty years. At the time of the Agreement's execution, Mrs. Hinton had a specific power of attorney authorizing her to act as his attorney-in-fact with regard to real estate transactions and "bank dealings" concerning their Nashville property. Despite knowing that this specific power of attorney did not authorize her to sign the Agreement on Mr. Hinton's behalf, and despite his instructions that she not sign the Agreement, Mrs. Hinton testified that she signed both her name and Mr. Hinton's name to the Agreement in November 2008. She explained that she had wrongfully informed the notary that she had authority under a power of attorney, which she presented to the notary. Mr. Hinton similarly testified that Mrs. Hinton had signed his name to the Agreement without his permission and despite his express disagreement with its contents. The trial court accepted the Hintons' testimony, specifically finding that Mrs. Hinton signed Mr. Hinton's name to the Agreement over his objection.

At trial, Mrs. Hinton also testified concerning the events following execution. She stated that after signing the Hintons' names, she promptly forwarded the Agreement to the Edmonds' attorney. However, she heard nothing further from the Edmonds until she contacted them regarding her intent to re-gravel the roadway. Mr. Edmonds allegedly objected to re-graveling based upon her failure to sign the Agreement. She claimed that she told Mr. Edmonds, prior to the Edmonds' execution and recordation of the Agreement, that she had signed the Agreement without Mr. Hinton's authority and that Mr. Hinton "was very mad about it." At trial, Mr. Edmonds denied that Mrs. Hinton disclosed having signed Mr. Hinton's name without his permission. However, he acknowledged that in his deposition he did not *deny* the statement having been made, but instead he simply *did not recall* it.

---

[3]The Edmonds fail to explain the significance, if any, of the trial court's finding regarding Mr. Edmonds' real estate experience. Because this factual finding apparently did not impact the issues involved in this appeal, we find it unnecessary to address the correctness of such.

On appeal, the Edmonds claim that the trial court erred in accepting the Hintons' testimony regarding execution and they maintain that Mr. Hinton, himself, signed the Agreement. In support of their argument, the Edmonds point to Mrs. Hinton's allegedly contradictory testimony: she testified that she had signed Mr. Hinton's name to "various documents over the years" but always with his permission, but she also testified that she knowingly signed Mr. Hinton's name to the Agreement without authority; she testified that when she signs Mr. Hinton's name, acting as his attorney-in-fact, that she "always" attempts to match *his* penmanship, but a document was introduced depicting Mrs. Hinton having signed Mr. Hinton's name in *her own* penmanship. The Edmonds also point out that the Agreement was notarized,[4] raising a presumption that the notary acted "'correctly' and lawfully[,]" *see Regions Bank v. Bric Constrs., LLC*, No. M2010-01898-COA-R3-CV, 2011 WL 6288033, at *4 n.7 (Tenn. Ct. App. Dec. 13, 2011) (quoting *Peltz v. Peltz*, No. M1999-02299-COA-R3-CV, 2000 WL 1532996, at *2 (Tenn. Ct. App. Oct. 18, 2000)), and they highlight both Mr. and Mrs. Hinton's respective testimonies that the execution of Mr. Hinton's name on the Agreement "resembled" or was "very similar" to his signature.

With regard to the conversation between Mrs. Hinton and Mr. Edmonds prior to recordation, the Edmonds point out that Mrs. Hinton's alleged request that Mr. Edmonds not record the Agreement was not set forth in the Hintons' complaint. This omission, they argue, is evidence that such request was never made. They also argue that the trial court erroneously "reached the conclusion that Mr. Hinton[, in a prior deposition,] had admitted being told by Jean Marie Hinton that she signed her husband's signature[.]" However, we find no indication that the trial court misunderstood Mr. Edmonds' testimony, as the Edmonds claim. Instead, the trial court accurately summarized his testimony, stating that "[Mr.] Edmonds at first denied Mrs. Hinton told him she had signed her Husband's name, but admitted that in his earlier deposition, he testified that he did not recall her saying that. He did not deny it in his deposition." The trial court specifically found that Mrs. Hinton had divulged her unauthorized execution to Mr. Edmonds, prior to the Edmonds' execution. However, this finding was based upon the trial court's implicit accreditation of Mrs. Hinton's testimony; at no point did the trial court erroneously conclude that Mr. Edmonds had acknowledged being privy to this information prior to execution.

The Edmonds ask this Court to overturn the trial court's above-cited factual findings, arguing that Mrs. Hinton's testimony should be given no weight, and further arguing that its findings are "in total disregard to clear and convincing testimony and Exhibits offered at

---

[4]The Hinton's signatures are individually acknowledged, as opposed to having been signed by an attorney in fact. The acknowledgment states "Before me . . . personally appeared Tommy Hinton and Wife, Jean Marie Hinton, to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same for the purposes therein contained."

trial." As stated above, "When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* We will not re-evaluate a trial court's credibility determination absent clear and convincing evidence to the contrary. *See Sweeney v. Tenney*, No. E2011-00418-COA-R3-CV, 2011 WL 4506332, at *1 (Tenn. Ct. App. Sept. 29, 2011) (citing *Hopper v. Moling*, No. W2004-02410-COA-R3-CV, 2005 WL 2077650, at *7 (Tenn. Ct. App. Aug. 26, 2005)).

Despite the Edmonds' protestations to the contrary, we find no clear and convincing evidence to overturn the trial court's credibility determinations which act as the foundation for its factual findings regarding execution and recordation. The record in this case indicates that after considering the testimony presented and the evidence submitted, the trial court was inclined to accept the Hintons' account of the events in question. The trial court was not required to reject Mrs. Hinton's testimony simply because she admitted a prior deception, as the Edmonds suggest. In sum, we affirm the trial court's findings that Mrs. Hinton signed Mr. Hinton's name without his consent and that Mrs. Hinton informed Mr. Edmonds of such action prior to the Edmonds' execution of the Agreement.

### B.  Validity of Agreement

#### 1.  Withdrawal

The trial court found that Mrs. Hinton's conduct–signing Mr. Hinton's name to the Agreement without his consent and notifying Mr. Edmonds of this conduct prior to the Edmonds' execution and recordation–constituted "a withdrawal of the offer to be bound by the [Agreement,]" which extinguished "the Edmonds' power to accept the [Agreement.]" An offer that is withdrawn prior to its acceptance may not thereafter be accepted. *See Mason v. Capitol Records, Inc.*, No. 01A01-9807-CH-00389, 1999 WL 976614, at *5 (Tenn. Ct. App. Oct. 28, 1999) (citing *Coate v. Tigrett*, 4 Tenn. App. 53 (1926)). A withdrawn offer "'leaves the matter as if no offer had ever been made.'" *Id.* (quoting *Coate*, 4 Tenn. App. at 53).

On appeal, the Edmonds dispute the trial court's withdrawal finding by again challenging the underlying conduct upon which the finding is premised. That is, they renew their contentions that Mr. Hinton, himself, signed the Agreement and that they were unaware

of any unauthorized execution of Mr. Hinton's name prior to their own execution and recordation of the Agreement. They do not contend that if the facts are as the trial court found, that such conduct would not provide a foundation for a finding of withdrawal. Based upon our affirmance of the trial court's findings–that Mrs. Hinton signed Mr. Hinton's name without his consent and that she notified Mr. Edmonds of such conduct–we likewise affirm its finding that Mrs. Hinton effectively withdrew the Agreement prior to the Edmonds' acceptance.[5]

## 2. Acquiescence

Seemingly in the alternative, the Edmonds argue, without citation to authority, that even if Mr. Hinton did not sign the Agreement, that he acquiesced to its contents by relying upon it and by failing to "get the document back[.]" The Edmonds' argument regarding acquiescence is as follows:

> [Mr. Hinton] was asked at what point he discovered that his wife had signed his name. Mr. Hinton could not recall the date but said it was after she had signed it and returned it to the lawyer's office in Memphis.
> Based upon the testimony of Jean Marie Hinton, she indicated that she returned the document to the attorney in November 2008. Mr. Hinton stated that he was mad when he discovered she had signed [it]. The record is void of any action by Mr. Hinton to get the document back after the November delivery, [or] to revoke or re[scind] the document. In fact, Mr. Hinton proceed[ed] to rely on the [Agreement] to send people out to make arrangements for graveling the road. This event creates the discovery by Mr. Edmonds of the execution of the [A]greement some 9 months after Mr. Hinton was informed that his wife had executed the [A]greement in 2008. This represents clear and convincing and undisputed testimony of acquiescence by Mr. Hinton to the [A]greement.

The portion of the trial transcript cited by the Edmonds indicates that the Hintons desired to have the roadway re-graveled, but it in no way suggests that Mr. Hinton–or anyone else–invoked the Agreement as authority to do so. Furthermore, the testimony cited does not demonstrate that Mr. Hinton learned of Mrs. Hinton's conduct nine months prior to the Edmonds' execution. Mr. Hinton simply stated that he became aware that his name had been

---

[5]On appeal, the Edmonds also argue that even if Mr. Hinton did not sign the Agreement, that *Mrs. Hinton's* right of survivorship is bound based upon her admitted execution of the Agreement. It is not clear that this issue was raised in the trial court below. However, based upon our affirmance of the trial court's finding of withdrawal by the Hintons, we deem this issue pretermitted.

placed on the Agreement "*after* [Mrs. Hinton] signed it and took it to the lawyer's office in Memphis." (emphasis added). We conclude that the evidence presented does not support a finding of acquiescence by Mr. Hinton, and therefore, we affirm the trial court's finding that Mr. Hinton "did not acquiesce in his Wife's signing his name to [the Agreement.]" Based upon our above conclusions, the trial court's invalidation of the Agreement is affirmed.[6]

## C. Easement by Virtue of Hintons' Deed

Finally, we consider the Edmonds' argument that the trial court erred in "concluding that the Hinton[s] possessed any easement rights by virtue of their deed[.]" The Edmonds contend that the warranty deeds in this case confer no easement rights to the Hintons because only the *Edmonds'* Warranty Deed–and not the *Hintons'* Warranty Deed–references an easement reservation. Additionally, the Edmonds point out that the Hinton's property "clearly touches a county road[,]" and they argue that the trial court lacked authority to create an easement merely for the Hintons' "convenient use." Essentially, the Edmonds argue that the Hinton's easement rights arise only from the Agreement; therefore, once the Agreement is declared a nullity, the Hintons have "[no] right to cross [the Edmonds'] property."

We acknowledge that in the trial of this matter, the Edmonds' counsel objected to the trial court's statement that "there's not much of an issue about whether or not there is an easement[,]" noting the Edmonds' position that if the Agreement is invalidated, "there is no easement at all." Beyond this single in-court statement, however, we find that the existence of an easement was not seriously challenged in the trial court. Both parties consistently referred to the roadway as an "easement" and all of the evidence presented indicated that the roadway was clearly visible and its purpose and necessity understood when the Edmonds purchased their lot. In their Complaint, the Hintons alleged as follows:

3.     That, the [Hintons] would further state and point out to the Court that the [Edmonds'] Lot is burdened by an Easement for the Benefit of the Plaintiffs and/or for the benefit of any owner of Lot No. 23, with the particular language establishing this Easement being quoted verbatim as follows: "[. . .] *and further by an easement for a driveway and turnaround for the benefit Lot 23, Lake Shore Estates, Phase I, along the southern and western boundaries of Lot 31, and this conveyance is made subject to all of the same."* The property owned by the [Hintons]

---

[6]In so ruling, we find it unnecessary to address the Hintons' argument that the Agreement lacked consideration.

is unimproved, and the property owned by the [Edmonds] is improved by a residential dwelling, and was so improved at the time that the Defendants purchased Lot No. 31.

The Edmonds' Answer is telling:

> 3.     The [Edmonds] would admit the allegations as contained in paragraph three.

Based upon the merely cursory argument in the trial court regarding the existence or non-existence of an easement as well as the Edmonds' own admission of the easement's existence, we find the issue is waived on appeal. *See Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009) (citations omitted).

Moreover, we find that even if this issue was properly raised in the trial court, the trial court made no finding that the Hintons' easement rights arose "by virtue of their deed[,]" as the Edmonds suggest. We find no statement in the trial court's written ruling that can be construed to evidence such a finding. Instead, it appears, at best, that upon nullifying the Agreement, the trial court based its finding of an easement upon either the reservation contained in the *Edmonds'* Warranty Deed or upon a finding of an easement by necessity. In its written ruling, the trial court acknowledged that a portion of the Hinton's Lot #23 "touches a road," but it noted the existence of "an approximate 80 foot ravine and drop-off" which prevented the road from providing reasonable access to the property. In sum, we find that the Edmonds failed to sufficiently challenge the existence of an easement in the trial court, and insofar as the argument was raised, we conclude that the trial court did not rely upon the Hintons' warranty deed, which the Edmonds contend was error.

## IV.   CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellants, Jerry L. Edmonds and Susan D. Edmonds, and their surety, for which execution may issue if necessary. This case is remanded, pursuant to applicable law, for collection of costs assessed by the trial court.

ALAN E. HIGHERS, P.J., W.S.

-12-